**AMERICAN HAWAII CRUISES, Plaintiff,**

v.

**Samuel K. SKINNER, et al., Defendants,**

**and**

**S/S Monterey Limited Partnership, Defendant–Intervenor.**

**AMERICAN MARITIME OFFICERS SERVICE, Plaintiff,**

v.

**Samuel K. SKINNER, et al., Defendants.**

Civ. A. Nos. 88–2217, 88–2618.

United States District Court, District of Columbia.

May 16, 1989.

As Corrected May 18, 1989.

J. Michael Cavanaugh, Stuart S. Dye, Mary Boney Denison, Graham & James, Washington, D.C., for plaintiff.

Mark Fox Evens, Kris Anne Monteith, Washington, D.C., for American Maritime Officers Service.

George P. Williams, Asst. U.S. Atty., Judiciary Center, Washington, D.C., for defendants.

Michael Joseph, Dyer, Ellis, Joseph & Mills, Washington, D.C., for defendant-intervenor S/S Monterey Ltd. Partnership.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

In these consolidated cases, the Court is called upon to delve into the murky waters of federal maritime law, which requires that, whenever a rebuilt vessel seeks to engage in trade between ports of the United States, the "entire rebuilding" must be conducted within this country. In August 1988, the United States Coast Guard found that a cruise vessel, the S/S MONTEREY, had not been "rebuilt" abroad and was therefore eligible for American coastal trade. Plaintiffs American Hawaii Cruises and American Maritime Officers Service now seek judicial review of that determination. Having plumbed the depths of the parties' arguments, the Court concludes that the Coast Guard strayed off course in issuing its decision.

I. Setting Sail: The Statutory and Regulatory Background

Federal maritime law prohibits foreign vessels from transporting passengers between ports in the United States. *See* 49 U.S.C.App. § 289. If, however, a ship has been built in this country and is owned by citizens of the United States, it may receive a license to engage in coastwise trade from the Secretary of Transportation. 46 U.S.C. § 12105(c). The license is not absolute, and one restriction is found in section 27 of the Merchant Marine Act of 1920 (the Jones Act):

> [N]o vessel which has acquired the lawful right to engage in the coastwise trade, by virtue of having been built in, or documented under the laws of the United States, and which has later been rebuilt, shall have the right thereafter to engage in coastwise trade, *unless the entire rebuilding, including the construction of any major components of the hull or superstructure of the vessel, is effected within the United States.*

49 U.S.C.App. § 883 (emphasis added). Interpreting this provision, which is commonly referred to as the "second proviso" to the Jones Act, the Coast Guard has issued regulations stating that a vessel is deemed to be "rebuilt" when "any considerable part of its hull or superstructure is built upon or is substantially altered." 46 C.F.R. § 67.27-3(a).

The focus of these consolidated cases is the S/S MONTEREY, which was originally built in Baltimore, Maryland in 1952 as a freight vessel. In 1956 the ship was rebuilt in the United States as a combination cargo/passenger vessel with cabin space for 365 passengers. When the owner of the S/S MONTEREY declared bankruptcy in 1978, all operations ceased and the ship was laid up in San Francisco. The ship was eventually purchased by S/S Monterey Limited Partnership (MLP), a group that intended to operate the S/S MONTEREY as a cruise ship among the Hawaiian Islands. Because necessary modifications to the vessel had been made both in the United States and in Finland, MLP sought guidance from the Coast Guard as to whether the work performed violated the "rebuilding" proscription contained in the second proviso to the Jones Act. The Coast Guard issued a series of four rulings, the last on August 8, 1988, which held that the S/S MONTEREY was not rebuilt within the meaning of regulations it had issued construing the second proviso.[1]

---

**1.** The new vessel's maiden voyage occurred on August 25, 1987, when it carried passengers from Baltimore to San Francisco. It is presently operating as a cruise ship in Hawaii.

## II. Trouble at Sea: The Instant Cases

One day after the Coast Guard's final ruling, the first of these consolidated cases (Civil Action No. 88–2217) was filed by plaintiff American Hawaii Cruises (AHC), a joint venture that currently operates two cruise ships in the Hawaiian Islands. Suing under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*, AHC contended that the S/S MONTEREY had been rebuilt abroad and that the Coast Guard's decisions to the contrary were unlawful, an abuse of discretion and unwarranted on the facts. It sought an order setting aside those rulings and injunctive relief precluding defendants, Secretary of Transportation James H. Burnley IV and Coast Guard Commandant Admiral Paul A. Yost, Jr., from issuing similar rulings in the future and ordering them to revoke the S/S MONTEREY's portfolio that allowed it to engage in coastwise trade.[2] Shortly thereafter, MLP's unopposed motion to intervene as a party-defendant was granted.

The second of these cases (Civil Action No. 88–2618) was commenced on September 16, 1988 by plaintiff American Maritime Officers Service (AMOS), a trade organization whose membership, according to its complaint, contains both present and potential competitors of the S/S MONTEREY in the Hawaiian cruise trade. AMOS's suit named the same defendants, made virtually identical arguments and requested almost identical relief as AHC's. Upon AMOS's motion and with the consent of all parties, the two cases were consolidated for all further proceedings by Order dated November 3, 1988. AHC, AMOS and MLP have now moved for summary judgment; the federal defendants have filed a motion to affirm the Coast Guard's decisions. In addition, the Court has received an *amicus* brief in support of plaintiffs from Matson Navigation Company, Inc. (Matson).[3] These motions are now ripe for decision.[4]

## III. Staying Afloat: Standing

■ The federal defendants and MLP contend that both plaintiffs lack standing to bring these lawsuits. For the reasons set forth below, the Court disagrees.

The APA provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

5 U.S.C. § 702. In *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed. 2d 184 (1970), the Supreme Court set forth a two-part test for determining questions of standing under this provision. First, the party bringing suit must meet Article III constitutional concerns and "allege[] that the challenged action has caused him injury in fact, economic or otherwise." 397 U.S. at 152, 90 S.Ct. at 829. As noted above, AHC operates two cruise ships that now compete with the S/S MONTEREY. It alleges that the rebuilding work done in Finland on the S/S MONTEREY saved its owners approximately $25 million and that the arrival of that vessel in the Hawaiian cruise market has diverted passengers that would otherwise have utilized one of its cruise ships.[5] AHC clearly satisfies the "injury in fact" requirement.

A potential plaintiff must also meet prudential requirements and show that "the interest sought to be protected by the complainant is arguably within the zone of

---

**2.** Pursuant to Fed.R.Civ.P. 25(d)(1), current Secretary of Transportation Samuel Skinner has been substituted for former Secretary Burnley. For convenience, the Court will refer to Secretary Skinner and Admiral Yost jointly as "the federal defendants."

**3.** Matson, which owns several cargo ships that operate between Hawaii and the United States mainland, moved to intervene in these cases in order to obtain the benefit of a favorable ruling on the "rebuilt" issue in a separate proceeding it now has pending before the Coast Guard. The Court denied Matson's motion by Order dated November 14, 1988 but granted its alternative request to participate as an *amicus curiae.*

**4.** The parties are to be commended for the excellent briefs submitted to the Court.

**5.** *See* Affidavit of Peter C.R. Huang, submitted with AHC's Opposition to MLP's Motion for Summary Judgment, ¶¶ 3–5.

interests to be protected or regulated by the statute." *Id.* at 153, 90 S.Ct. at 830. *Clarke v. Securities Industry Association,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), made clear that the "zone of interests" test "is not meant to be especially demanding," and that review should be denied only when "the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." 479 U.S. at 399, 107 S.Ct. at 757.[6] Justice White observed that "at bottom the reviewability question turns on congressional intent, and all indicators helpful in discerning that intent must be weighed." 479 U.S. at 400, 107 S.Ct. at 751.

Defendants contend that AHC is not within the zone of interests protected by the Jones Act. They first assert that the "rebuild" restriction in the second proviso was intended to protect domestic *shipyards*, not domestic shipowners like AHC. Defendants correctly note that *Pennsylvania R.R. Co. v. Dillon,* 335 F.2d 292 (D.C. Cir.), *cert. denied,* 379 U.S. 945, 85 S.Ct. 437, 13 L.Ed.2d 543 (1964), denied standing to three American shipowners who sought to challenge a Coast Guard determination that two other vessels were not "rebuilt" and that the *Dillon* court observed that the second proviso "was intended basically as a benefit to *shipyards* not shipowners in the coastwise trade." 335 F.2d at 295–96 n. 5 (emphasis in original). Their reliance on *Dillon* is misplaced, however, for that decision was issued prior to the Supreme Court's formulation of the "zone of interests" test in *Data Processing, Clarke* and other cases. Recognizing "the trend . . . toward enlargement of the class of people who may protest administrative action," *Data Processing,* 397 U.S. at 154, 90 S.Ct. at 830, the Court has recently adopted a broad interpretation of the phrase "a relevant statute" in 5 U.S.C. § 702 and has made clear that courts should examine the entire legislative scheme, rather than just a

particular provision, in considering the "zone of interests" inquiry. *Clarke,* 479 U.S. at 396–97, 107 S.Ct. at 755–56.

A number of post-*Dillon* maritime decisions from this circuit have utilized this more expansive approach. In *Autolog Corp. v. Regan,* 731 F.2d 25 (D.C.Cir.1984), for example, three shipowners and a union of seamen brought suit to preclude a foreign vessel from carrying passengers and their automobiles from New York to Florida by way of the Bahamian islands. In finding that the union had standing, the court did not focus exclusively on the statute, 46 U.S.C.App. § 289, at issue. Rather, it noted that that provision was part of "*the laws* creating a coastwise monopoly for domestic shippers and crews" and "read [it] together" with another provision, 46 U.S.C.App. § 672a, which required American crews on American ships. 731 F.2d at 30 (emphasis added). It found standing because the maritime laws "function together to ensure the American monopoly over all aspects of coastal shipping, and one crucial purpose of this monopoly is the protection and development of American crews." *Id.* n. 3. In *Manhattan Tankers, Inc. v. Dole,* 587 F.Supp. 473 (D.D.C.1984), *aff'd,* 787 F.2d 667 (D.C.Cir. 1986), the court held that a shipowner had standing to attack a Coast Guard ruling that another vessel could enter the coastwise trade pursuant to the Wrecked Vessels Statute, 46 U.S.C.App. § 14. Although the statute had a rebuilding requirement that would, under the approach used in *Dillon,* appear to benefit shipyards only, Judge Richey also considered other provisions of maritime law (46 U.S.C.App. §§ 289 and 883) which insulated shipowners from competition with foreign-owned or foreign-built vessels. 587 F.Supp. at 476. Finally, while the court in *Curran v. Laird,* 420 F.2d 122 (D.C.Cir. 1969) (en banc), did not expressly overrule *Dillon,* it did cite that decision as an example of outdated caselaw that required "an explicit statutory provision . . . to confer

---

**6.** *See also Copper & Brass Fabricators Council v. Department of Treasury,* 679 F.2d 951, 952 (D.C. Cir.1982) (zone test "requires some indicia—however slight—that the litigant before the court was intended to be protected, benefited or regulated by the statute under which suit is brought").

standing on a competitor." 420 F.2d at 126 & n. 8. Defendants' argument that the second proviso, in and of itself, bars suit by AHC must be rejected.[7]

This Court's inquiry must therefore be expanded beyond the second proviso's "rebuild" requirement to include the coastwise laws as a whole. Two main purposes are evident. The first is suggested in the preamble to the Jones Act, which provides:

It is necessary for the national defense and for the proper growth of its foreign and domestic commerce that the United States shall have a merchant marine of the best equipped and most suitable types of vessels sufficient to carry the greater portion of its commerce and serve as a naval or military auxiliary in time of war or national emergency, ultimately to be owned and operated by citizens of the United States; and it is declared to be the policy of the United States to develop and encourage the maintenance of such a merchant marine.

46 U.S.C.App. § 861. Defendants maintain that allowing AHC to bring this suit would frustrate, not serve, this interest because the S/S MONTEREY is a domestic vessel that enhances the viability of this country's merchant marine. But that argument is misplaced for if, as plaintiffs assert, the ship were rebuilt abroad, it is ineligible to enter the coastwise trade under the second proviso and may therefore not be considered a "domestic" vessel. As the court of appeals refused to do in *Public Citizen v. FTC*, 869 F.2d 1541, 1549 (D.C.Cir.1989), I will not "bootstrap" the argument on the merits to determine whether AHC has standing to assert its position.

A second aim of the maritime laws is, as noted above, maintenance of an American monopoly in the coastwise trade. *See Autolog*, 731 F.2d at 28 (referring to "a legal structure that guarantees a coastwise monopoly to American shipping"). As Judge Kaufman so aptly put it:

Like all maritime nations of the world, the United States treats its coastwise shipping trade as a jealously guarded preserve. In order to participate in this trade, a vessel's credentials must be thoroughly American. The ship must have been built in an American shipyard and must be owned by American citizens. Moreover, it must not have trifled with its American heritage.

*Marine Carriers Corporation v. Fowler*, 429 F.2d 702, 703 (2d Cir.1970), *cert. denied*, 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed. 2d 631 (1971). Similarly, Judge Gasch noted in *American Maritime Association v. Blumenthal*, 458 F.Supp. 849, 856 (D.D.C. 1977), *aff'd*, 590 F.2d 1156 (D.C.Cir.1978), *cert. denied*, 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979), that "Congress considered American ship owners and operators, shipbuilders, and seamen to be protected by" the Jones Act, and Judge Flannery has observed that the Act was intended "to benefit American shipowners competing economically in the coastwise trade." *Alaska Excursion Cruises, Inc. v. United States*, 603 F.Supp. 541, 546 (D.D. C.1984). As the American owner of a vessel now engaged in coastal trade facing (what it believes is) an inappropriate advantage resulting from the MONTEREY's rebuilding in Finland, AHC is surely within the zone of interests that the Jones Act is designed to protect.

Defendants nevertheless continue to argue that standing is lacking in the instant cases. They maintain that, because AHC's two vessels, the S/S OCEANIC INDEPENDENCE and the S/S OCEANIC CONSTITUTION, were "sold foreign" and are only able to engage in coastal trade as a result of special legislation enacted by the Congress, *see* Pub.L. 96–111, 93 Stat. 845 (1979); Priv.L. 97–13, 96 Stat. 2617 (1982), these ships "do not qualify for coastwise privileges under the Jones Act." Motion to Affirm at 10; *see also* MLP's Motion for Summary Judgment at 13. This position lacks merit. For one thing, the very same legislation that granted coastwise privileges to AHC's ships also admitted the S/S MONTEREY to domestic passenger trade.

---

7. The federal defendants appear to concede this point when they state that "[s]ubsequent decisions within this Circuit have interpreted the

'zone of interests' protected by the Jones Act more broadly" than *Dillon*. Motion to Affirm at 9.

*See* Section 3 to Pub.L. 96–111. Accepting defendants' argument would therefore deny the S/S MONTEREY the same privileges that it presently exercises under the Coast Guard's four "rebuilding" rulings. And in any event, the Coast Guard's own regulations refute its present position. They provide:

(a) A coastwise license endorsement entitles the vessel to employment in the coastwise trade ...

(b) The following vessels ... are eligible for a coastwise license endorsement:

(1) Vessels built in the United States ...

(5) Vessels granted coastwise trading privileges by special legislation ...

46 C.F.R. § 67.17–5. As AHC observes, *see* Opposition to Motion to Affirm at 15–16, it would be illogical for Congress to enable AHC's ships to participate in the coastal trade monopoly while simultaneously leaving them defenseless against perceived threats to that monopoly from ships that may have been rebuilt abroad contrary to the second proviso.

Finally, defendants assert that AHC cannot be heard to complain about unfair advantage from abroad because, in the legislation granting the S/S OCEANIC INDEPENDENCE coastal privileges, Congress exempted the ship from the second proviso's "rebuild" requirement and allowed some work to be performed abroad. *See* Pub.L. 96–111, section 1(1)(B). This contention, however, ignores the fact that no foreign work was done on the S/S OCEANIC CONSTITUTION, the other vessel owned by AHC. More importantly, the argument raised by defendants is one better addressed to the Congress, not this Court. It was Congress that decided to admit the S/S OCEANIC INDEPENDENCE to the coastal trade and it was Congress that decided to grant the exemption to the second proviso. Having received those benefits, AHC is entitled to bring suit to assure that they are protected by the rulings of the Coast Guard. AHC has standing.

█ AMOS is likewise entitled to challenge the Coast Guard decisions under review. An organization such as AMOS has standing to sue on behalf of its members when (1) one of its members would otherwise have standing to sue; (2) the interests its seeks to protect are germane to the purposes of the organization; and (3) the claims presented and relief requested do not require the individual participation of the organization's members. *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). This test is satisfied here. First, the Court has concluded that AHC, one of AMOS's members, has standing to sue. In addition, as an organization that seeks to promote and protect the owners, operators and seamen of its member-vessels, AMOS's participation in these cases concerning the "foreign rebuild" issue is directly relevant to its central purposes. Finally, because AMOS seeks judicial review of certain Coast Guard determinations under the APA, resolution of these suits will not require individual member participation. AMOS, like AHC, has standing to sue.

## IV. Rocking the Boat: Other Threshold Arguments

MLP (but not the federal defendants) advances a series of preliminary contentions that it believes requires dismissal of these cases. None is persuasive.

█ 1. MLP first dredges up the venerable doctrine of laches, which is designed "to promote diligence and prevent enforcement of stale claims." *Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 843 (D.C.Cir.1982). To mount a successful laches defense, two elements must be shown: "lack of diligence by the plaintiff and injurious reliance thereon by the defendant." *Id.* MLP contends that unreasonable delay exists because, although plaintiffs knew or should have known that the S/S MONTEREY was being rebuilt and that the owners of the ship would seek Coast Guard guidance, they waited until almost one year after the Coast Guard's first ruling in August 1987 before filing this lawsuit. This argument is meritless. The APA states that only "final agency action" is subject to judicial review and

that a "preliminary, procedural or interme-diate agency action or ruling" may be re-viewed only "on review of the final agency action." 5 U.S.C. § 704. The Coast Guard issued four rulings over a one-year period from August 1987 to August 1988 regard-ing the work being performed on the S/S MONTEREY, but the first three (issued on August 6, 1987, October 7, 1987 and June 29, 1988) were clearly preliminary decisions not yet ripe for judicial review. The Au-gust 6, 1987 letter, for example, states:

The work to be done in Finland ... does not appear to be a rebuilding within the meaning of 46 C.F.R. § 67.26–3. This conclusion is based solely on the prelimi-nary information which you furnished ... A final determination will be made upon completion of the work and submis-sion of the certificate and other papers required by § 67.27–3.

Exhibit 24 to Administrative Record (AR) at 1. The October 7, 1987 decision likewise provides:

This preliminary determination is based on all presentations made to date. The submissions set forth in 46 C.F.R. § 67.27–3 are required before a final de-termination can be made.

*Id.* Exhibit 20 at 1. And the June 29, 1988 determination similarly reminded that the necessary submissions should be tendered "upon the completion of all work." *Id.* Exhibit 13 at 2. Although these three rul-ings made clear that additional work and submissions would be forthcoming, no such qualification was present in the August 8, 1988 letter. It stated that "[t]he filing requirements of 46 C.F.R. 67.27–3(b) have been met" and unequivocally announced that "the work performed in Finland is not considered rebuilding within the meaning of the second proviso." *Id.* Exhibit 6 at 1. This last ruling was therefore the "final agency action" that plaintiffs were entitled to challenge.[8] AHC brought suit one day later; AMOS did so within one month. The

Court finds absolutely no delay in the com-mencement of these suits.

Nor has MLP adequately demonstrated prejudice. Defendant-intervenor's main ar-gument is that it is now left "without op-tions" because the work has already been performed in Finland and because it "will have invested over $30 million in a substan-tially worthless venture" if plaintiffs pre-vail in these actions. MLP's Motion for Summary Judgment at 17. That assertion of prejudice is questionable, however, for MLP nowhere states why the S/S MONTE-REY could not engage in non-coastwise trade (through cruises to foreign ports or cruises "to nowhere") should its coastwise license be revoked. In addition, while two types of prejudice were identified in *Gull,* neither applies to MLP's situation. Al-though the delay in filing suit may cause the disappearance of evidence or witnesses important to the defendant, *see* 694 F.2d at 844, these APA cases do not implicate those concerns. Similarly, "the defendant may have changed its position in a manner that would not have occurred but for plain-tiff's delay," *id.,* but MLP nowhere ex-plains how it changed its position as a result of (what it believes was) plaintiffs' unreasonable delay. Because neither delay nor prejudice are present, the laches de-fense asserted by MLP is insupportable.

2. MLP next maintains that injunctions are not always granted when statutes have been violated and argues that a balancing of the respective harms in this case pre-cludes entry of the injunctive relief sought by plaintiffs. Defendant-intervenor cor-rectly notes that in *Weinberger v. Rome-ro–Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), the Supreme Court reversed an injunction ordering the Navy to obtain a proper permit before continuing discharges of pollutants that did not con-form to permit requirements contained in the Federal Water Pollution Control Act. In doing so, however, the Court predicated

---

**8.** Moreover, the affidavit submitted by the Coast Guard official with final responsibility for the S/S MONTEREY rebuild determinations con-firms what a plain reading of the rulings dis-closes. It specifically characterized the first three as "preliminary" and the last one as "fi-

nal," *see* Declaration of Thomas L. Willis, Exhib-it 1 to Administrative Record, at 13–17, and noted that "a final rebuild determination [can-not] be made ... until the foreign work is completed." *Id.* at 11.

its decision on the existence of alternative remedies, such as fines and criminal penalties, for statutory violations, as well as the "scheme of phased compliance" set forth in the Act. 456 U.S. at 314–18, 102 S.Ct. at 1804–06. Those circumstances are not present here. The APA, of course, only permits courts to "hold unlawful and set aside" improper agency action, with no mention of alternative measures or phased-in compliance. Moreover, MLP's balancing of the equities is quite skewed: it appears to have overemphasized the harm it would suffer were the requested relief granted ("substantially worthless venture") and it has labeled the potential harm to plaintiffs as "purely speculative." MLP's Motion for Summary Judgment at 20. As this Court has previously observed, neither of these characterizations is accurate. Finally, MLP's assertion that an injunction would not "effectuate the congressional purpose behind the statute," *Securities Industry Ass'n v. Board of Governors*, 628 F.Supp. 1438, 1443 (D.D.C.1986), is clearly foreclosed by my prior conclusion that plaintiffs are affected by and have standing to challenge the Coast Guard's application of the "rebuilding" rule. This argument must therefore be denied.

 3. MLP's final threshold contention focuses on the license granted to the S/S MONTEREY to operate in the coastwise trade. It asserts that, because maritime law provides no private right of action to plaintiffs, they can only prevent the S/S MONTEREY from operating by an order compelling the Coast Guard to revoke the ship's license. MLP then suggests that,

because the doctrine of equitable estoppel and other legal impediments would prevent the Coast Guard from revoking the S/S MONTEREY's license, plaintiffs may not obtain that relief indirectly in these cases.

The Court must disagree. For one thing, defendant-intervenor has not presented a single authority to support its somewhat novel theory, observing only that it is grounded in "equity." MLP's Motion for Summary Judgment at 21. The APA, however, grants a right of judicial review to any individual "adversely affected or aggrieved by" administrative action, provided that the party demonstrates that it is within the "zone of interests" protected by a particular statute. If MLP is unhappy about the broad judicial review provisions contained in the APA, its arguments are more appropriately addressed to Congress, not this Court. But even leaving that contention aside, plaintiffs have demonstrated that none of the legal devices relied on by MLP would preclude the government from revoking the S/S MONTEREY's license.[9] Finally, taken to its logical extreme, MLP's argument would effectively preclude competitors from obtaining review of licenses granted by federal government whenever the licensees had expended funds in reliance on agency rulings. The Court is not willing to embrace such a course of action.

## V. Parting the Waters: The Merits

### A. *Navigational Aids: The Standard of Review*

Plaintiffs bring these suits pursuant to 5 U.S.C. § 706(2)(A), which authorizes the

---

9. Although the question whether equitable estoppel may ever apply to the government is still an open issue, *Heckler v. Community Health Services*, 467 U.S. 51, 60–61, 104 S.Ct. 2218, 2224–25, 81 L.Ed.2d 42 (1984), an essential element for invoking the doctrine is a showing that the party to be estopped engaged in some kind of "affirmative misconduct." *Schweiker v. Hansen*, 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1981) (per curiam). While MLP may have relied on the Coast Guard's rulings in continuing with its work, it has not suggested how it was misled by the agency in the process, and the record amply demonstrates that MLP was well aware of the risks that it was taking during the construction process. *See* AR Exhibit 22 at 1 (taking certain steps "[i]n order to

avoid any ... action ... that might jeopardize the Vessel's coastwise privileges in the future"). Defendant-intervenor also states that its license is protected from revocation by due process and retroactivity concerns, but it bases that conclusion on criminal cases inapposite to the civil context and its argument ignores the fact that vessel license may be canceled when the Coast Guard determines that its issuance was "improper for any reason." 46 C.F.R. § 67.23–11(a). Finally, although MLP asserts that an agency may only revoke a license when it gives notice and an opportunity to respond to the affected licensee, the provision on which it relies—5 U.S.C. § 558(c)—only governs "the institution of *agency* proceedings" for license revocation but places no limitation on a *court's* ability to do so.

Court to overturn agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." As the Supreme Court has noted, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). At the same time, the court must assure that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)). Before reaching that determination, the Court must address a preliminary question raised by plaintiffs: whether the Coast Guard properly interpreted the second proviso when issuing the S/S MONTEREY "rebuild" rulings. Resolution of this issue is governed by the Supreme Court's widely-cited passage in *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984):

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. at 842–43, 104 S.Ct. at 2781 (footnotes omitted). To these questions the Court now turns.

## B. *Interpretation of the Second Proviso*

■ The parties adopt widely-divergent views of the second proviso. The federal defendants and MLP assert that the phrase "entire rebuilding" is a term of art, with a lengthy history and a well-defined administrative meaning. This meaning is expressed in the Coast Guard's regulations, which state that "[a] vessel is rebuilt when any considerable part of its hull or superstructure is built upon or substantially altered." 46 C.F.R. § 67.27–3(a). This interpretation, they contend, is entitled to deference from the Court because it is longstanding, has been consistently applied by the agency and has been recently ratified by Congress. Plaintiffs and amicus *Matson* disagree. They maintain that the meaning of the second proviso is clear and unambiguous, prohibiting any rebuilt vessel from the coastwise trade unless the "entire rébuilding" was accomplished in the United States. According to AHC, AMOS and Matson, the legislative history of the second proviso shows that Congress has allowed for certain limited exemptions to its rebuild prohibition, but none so sweeping as that permitted by the Coast Guard in the case of the S/S MONTEREY.

The Supreme Court has indicated that courts should employ "traditional tools of statutory construction" in determining whether Congress has spoken to the precise question at issue, the first part of the *Chevron* inquiry. *NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 108 S.Ct. 413, 426, 98 L.Ed.2d 429 (1987). The starting point, of course, is the language and structure of the statute involved. Congress did not provide any definition of the words "entire rebuilding," however, although it did so for other terms used in the statute. *Compare* 46 U.S.C. App. § 888 (defining "person," "vessel," "documented," and "citizen"). Moreover, while the words "entire rebuilding," taken by themselves, would appear to require that *no* rebuilding be done abroad, Congress qualified the second proviso, forbidding operation in the coastwise trade "unless the entire rebuilding, including the

**462**

construction of any *major* components of the hull or superstructure of the vessel, is effected within the United States." *Id.* § 883 (emphasis added). In requiring that "major" components be built in the United States, the second proviso implies that some components need not. The extent of permissible rebuilding, a matter that lies at the heart of this case, is not spelled out.

Another indicia of congressional intent is the history of the provision at issue and, to reconcile the parties' differences as to whether Congress has addressed the issue presented here, a rather lengthy exegesis is in order.

Since the early days of this Nation, federal maritime policy has required that vessels operating in coastwise trade be built in the United States and owned by American citizens. Act of March 1, 1817, ch. 31, 3 Stat. 351. Prior to 1956, however, our law did not prohibit domestic ships from being rebuilt abroad. In that year, the House Merchant Marine Committee noted:

> With major developments in technology in recent years there have been instances of American-owned, American-built vessels which have been substantially rebuilt in foreign shipyards, and then have returned to operate in American coastwise trade. Even though these rebuildings have been so extensive as to completely change the character of the vessels, the existing law does not subject the owners to payment of duty, nor is there any restriction against their use in domestic shipping service. This appears to be a gap in the law, which is clearly inconsistent with traditional policy. This bill is designed to close the gap and deny the right of vessels rebuilt abroad to operate thereafter in the domestic trade.

H.Rep. No. 2293, 84th Cong., 2d Sess. 2 (1956) (H.Rep. 84–2393). Responding to this problem, a bill was introduced in Congress that prohibited "rebuilt" vessels from engaging in the coastwise trade and defined that term as "altered in form of burden, by being lengthened or built upon, or from one denomination to another, by the mode or method of rigging or fitting." *To Prohibit Coastwise Operation of Ves-*

*sels Rebuilt Outside the United States: Hearings on H.R. 6025 and 6140 Before the Subcomm. on Merchant Marine of the House Comm. on Merchant Marine and Fisheries,* 84th Cong., 2d Sess. 1 (1956). Two federal agencies expressed reservations about this definition, however. Without offering alternative language, a representative from the Department of Commerce testified that "[w]e believe that some clarification of the definition of 'rebuilt' is desirable, in that it may be so general as to unduly penalize a shipowner with the loss of his coastwise privilege because of some relatively minor alteration of the ship," *id.* at 2–3. The Treasury Department official was more explicit. He noted that the proposed definition of "rebuilt" was taken from another statute that had been construed

> to include any alteration which results in a change of description appearing on the vessel's register. One instance is an alteration resulting in a tonnage change.
>
> If the definition is enacted in its present form, an alteration resulting in a minor change of tonnage would deprive the vessel of coastwise privileges. For example, alteration of a bait tank on a fishing vessel, or the installation of a deck chair compartment on the deck of a passenger vessel, might be sufficient to class the vessel as rebuilt under H.R. 6025.

*Id.* at 13. The representative concluded by suggesting that

> [y]our committee may desire to omit the definition or include a new one based upon the principle of *United States v. The Grace Meade* (D.C., E.D.Va., 1876) (25 Fed.Cas. 1387, Fed.Cas. No. 15,243) which was adopted by the Supreme Court in *New Bedford Dry Dock Co. v. Purdy (The Jack–O–Lantern)* ((1922) 258 U.S. 96 [42 S.Ct. 243, 66 L.Ed. 482]).

*Id.* The version of the bill approved by the House Merchant Committee deleted the language defining the term "rebuilt" and permitted the Secretary of Treasury to promulgate "such regulations as may be necessary to carry out the purposes of this Act." *See* H.Rep. 84–2293 at 1–2. The

Committee noted that its changes were "in line with recommendations of the Departments." *Id.* at 2.

The Senate then held its own hearings, and similar concerns were voiced by federal officials. *See Amendments to Merchant Marine Act, 1936: Hearings on S. 1864 and H.R. 6025 Before a Subcomm. of the Comm. on Interstate and Foreign Commerce,* 84th Cong., 2d Sess. 3–4, 5–6 (1956). The Committee on Interstate and Foreign Commerce made the same changes as the House and its report observed:

> As originally introduced, the bill defined the term "rebuilt" in language which the Treasury Department report stated "would apparently be broad enough to include a minor alteration affecting tonnage." As amended, the bill does not define the term "rebuilt," leaving the interpretation to the courts. As the Treasury Department report memorandum (appended) notes, the Supreme Court has adopted a definition of the term (which would be applicable) . . .

S.Rep. No. 2395, 84th Cong., 2d Sess. 1–2 (1956) (S.Rep. 84–2395), U.S.Code Cong. & Admin.News 1956, pp. 3162–3163. The Committee then set forth the *Grace Meade* definition of "rebuilding." *Id.* at 2. When Congress enacted the second proviso, no definition of the term was included:

> That no vessel of more than five hundred gross tons which has acquired the lawful right to engage in the coastwise trade, either by virtue of having been built in or documented under the laws of the United States, *and which has later been rebuilt* outside the United States, its Territories (not including trust territories), or its possessions shall have the right thereafter to engage in the coastwise trade.

Pub.L. No. 84–714, § 1, 70 Stat. 544 (1956) (emphasis added). The 1956 Act authorized the Secretary of Treasury to "prescribe such regulations as may be necessary to carry out the purposes of this Act." *See* 70 Stat. 544, § 3. The next year, the Customs Service (the agency then responsible for vessel documentation) amended its regulations to provide that a vessel would be considered "rebuilt" if "any considerable part of the hull in its intact condition without having been broken up is built upon or substantially altered." 22 Fed.Reg. 6,380, 6,381 (1957). This definition was the one referred to in the Senate Report and was drawn from the aforementioned *Grace Meade* decision.

After passage of the second proviso, owners of domestic ships sought to evade the "rebuild" requirement by constructing large ship sections in foreign countries, towing them to the United States, and installing them in the middle of American-built ships. In 1960, the Customs Service ruled that installation of these "midbodies" would not violate the "rebuild" requirement contained in the second proviso. Various shipping interests protested this decision, and a bill was introduced to amend the second proviso to bar rebuilt vessels from coastwise privileges "unless the entire rebuilding, including the construction of major components of the hull or superstructure of the vessel, is effected within the United States." *See Hearings Before the Merchant Marine and Fisheries Subcomm. of the Senate Comm. on Interstate and Foreign Commerce,* 86th Cong., 2d Sess. 171 (1960). The report of the House Merchant Marine Committee noted that the bill was needed to address the "loophole" concerning the domestic addition of midbodies. H.Rep. No. 1887, 86th Cong., 2d Sess. 3 (1960), U.S.Code Cong. & Admin. News 1960, p. 2664. The Senate Report recounted the midbody problem and also observed that

> The major components of hull or superstructure cited in the bill would certainly apply to vessel sections capable of floating and being towed but, in the context of S. 3189, your committee feels that this definition should be expanded to include any component which relates to, or changes, the configuration of the vessel.

In a memorandum accompanying its report on the bill, the Department of the Treasury noted that under previous rulings of the Department, extending back nearly 80 years, the engine of a vessel is not considered a hull component, nor are certain other equipment and installations,

such as hydrofoils, navigation machinery, etc.

This bill does not affect any of those items but is intended to apply chiefly to such major components of the hull or superstructure as noted above.

S.Rep. No. 1279, 86th Cong., 2d Sess. 3 (1960). Congress enacted the changes to the second proviso as originally proposed, forbidding coastwise trading "unless the entire rebuilding, including the construction of any major components of the hull or superstructure of the vessel, is effected within the United States." Pub.L. No. 86–583, § 2, 74 Stat. 321 (1960). Shortly thereafter, the Customs Service amended its regulations to define "rebuilt" in the same manner as the 1960 Act. *See* 25 Fed.Reg. 13,687, 13,687 (1960). In 1982, as part of a general revision of its vessel documentation regulations, the Coast Guard (which was by now the agency charged with issuing "rebuilt" rulings) rephrased its definition as follows:

A vessel is rebuilt when any considerable part of its hull or superstructure is built upon or is substantially altered.

47 Fed.Reg. 27,490, 27,503 (1982). This definition, which was codified at 46 C.F.R. § 67.27–3, has remained unchanged since that time.

Having surveyed this history, the Court concludes that Congress has not "directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781. When it first considered the issue in 1956, Congress removed proposed explanatory language that would have defined the word "rebuild" and allowed the Secretary of Treasury to promulgate regulations defining the term.[10] When the matter was revisited in 1960, the "major components" qualifying language was added, but the legislative history makes clear that this phraseology was specifically designed to remedy the midbody problem. At no time did Congress attempt to draw a line artic-

ulating how much foreign rebuilding would violate the second proviso, nor did it list the specific components that it considered to be "major." Congress knows how to legislate in minute detail when necessary, *see, e.g.,* 46 U.S.C.App. §§ 808 & 814, yet did not do so in this instance.

Because Congress has not addressed the question presented here, the second step of the *Chevron* analysis precludes this Court from "impos[ing] its own construction" on the second proviso and requires a determination of whether the Coast Guard's regulation is based on "a permissible construction" of the statute. 467 U.S. at 843, 104 S.Ct. at 2781. The Court concludes that it is. As noted above, the current definition of "rebuild" in the Coast Guard regulations closely resembles the definition provided in *Grace Meade* decision. That language was described as "sound and helpful" by the Supreme Court, *see New Bedford Dry Dock Co. v. Purdy,* 258 U.S. 96, 100, 42 S.Ct. 243, 244, 66 L.Ed. 482 (1922), and was cited with approval by the Senate Committee on Interstate and Foreign Commerce when the second proviso was originally enacted in 1956. *See* S.Rep. 84–2395 at 1–2. Given the elimination in 1956 of proposed language that may have precluded minor alterations, the 1960 amendment of the proviso (which only speaks of "major" components and was designed to reach the "midbody" problem), and the agency's involvement in the drafting of these statutes, the definition stating that a vessel is "rebuilt" when "any considerable part of its hull or superstructure is built upon or is substantially altered" is sound under *Chevron.* Finally, the Coast Guard's regulation is longstanding, since it was published just after enactment of the 1956 Act and has remained relatively unchanged since that time. For these reasons, the Court finds that the definition of rebuilding contained in 46 C.F.R. § 67.23–3(a) is a reasonable interpretation of the second proviso of the Jones Act.[11]

---

**10.** Moreover, the Senate Interstate and Foreign Commerce Committee noted that it was "leaving the interpretation to the courts." S.Rep. 84–2395 at 1, U.S.Code Cong. & Admin.News 1956, p. 3162. It is difficult to imagine a more un-

equivocal indication of silence with respect to an issue of statutory interpretation.

**11.** The Commercial Fishing Industry Vessel Anti–Reflagging Act of 1987, Pub.L. No. 100–239, 101 Stat. 1778 *et seq.* (1988), amended mari-

## C. *The Coast Guard's Decision*

■ Although the Coast Guard cited its "rebuild" regulation in its rulings on the S/S MONTEREY, it did not decide the case under that standard. The final Coast Guard decision issued on August 8, 1988 stated, without elaboration, that "the work performed in Finland is not considered rebuilding within the meaning of the second proviso." AR Ex. 6. Nor did the second preliminary ruling, dated October 7, 1987, provide any explanation for its conclusion that proposed work would not constitute a rebuilding. AR Ex. 20. The agency's other two rulings faintly suggest the test that was applied, however. On August 6, 1987, for example, the Coast Guard determined that certain work did not appear to qualify as a rebuilding but stated that its ruling "does not include considerations of any structural repairs which may have to be made." AR Ex. 24. And the third preliminary ruling of June 29, 1988 found that certain work was permissible under the second proviso because it was "overwhelmingly non-structural in nature." AR Ex. 13.

The materials submitted by the federal defendants to the Court make clear the test that was applied in this case. In a declaration submitted with the administrative record, the Chief of the Coast Guard's Vessel Documentation Branch discusses the "rebuild" question and states:

To make a proper determination of whether the relevant work is major, considerable or substantial, so as to constitute rebuilding, the structural work must be considered apart from the non-structural work.

Declaration of Thomas L. Willis (Willis Dec.), AR Ex. 1, at 10. The Coast Guard official responsible for the S/S MONTEREY decision made the same point, repeatedly stating that all "structural" work to the ship had been done in the United States while "non-structural" work was performed in Finland. Declaration of Lieutenant Commander Gregory L. Oxley, AR Ex. 2, at 2–5. The federal defendants' pleadings are also consistent in this regard. Describing the 1960 amendments to the second proviso, they state that major components must be performed in the United States but note that "non-structural modifications ... continued to be permissible." Motion to Affirm at 19. They also observe that:

[T]he regulations defining the term "rebuilding" have remained virtually unchanged since the enactment of the second proviso. These regulations provide that a vessel is rebuilt "when any considerable part of the hull or superstructure is built upon or substantially altered." 46 C.F.R. 67.27–3. *As applied,* these regulations require substantial structural alterations before the work will be considered a rebuilding. Mere cosmetic or

---

time law by prohibiting fishing vessels from being rebuilt abroad. The federal defendants and MLP contend that, in passing this statute, Congress ratified the Coast Guard's interpretation of the second proviso. As support for their theory, they rely on the following passage from a section-by-section analysis of the legislation introduced on the floor of the Senate:

This section adds a provision ... that defines "rebuilt" as "building upon or substantially altering any considerable part of the hull or superstructure of the vessel." This provision is patterned on the Coast Guard's regulatory definition used to interpret the Second Proviso ... It is contemplated that in administering requirements for U.S. fishing, fish processing, and fish tender vessels to be rebuilt in the United States, the Coast Guard will rely on precedents established by its letter rulings interpreting the Second Proviso.

133 Cong.Rec. S18,337 (daily ed. Dec. 17, 1987). Defendants' position must be rejected. It is well-settled that ratification takes place only when there exists "express congressional approval of an administrative interpretation." *AFL–CIO v. Brock,* 835 F.2d 912, 915 (D.C.Cir. 1987). Here, however, the Senate's proposed definition based on the Coast Guard's regulation never became law. The House decided to "incorporate[ ]" the definition of rebuilt from the second proviso (rather than from the Coast Guard's regulatory definition), *see* H.Rep. No. 423, 100th Cong., 1st Sess. 13 (1987), U.S.Code Cong. & Admin.News 1987, p. 3245, and section 3 of the Act stated that the term "rebuilt" as used in the fishing vessel context "has the same meaning as in the second proviso" of the Jones Act. Although no ratification has occurred, the factors delineated in the text still convince the Court that the agency's definition of "rebuilt" is permissible under *Chevron.*

aesthetic changes, non-structural in nature, do not constitute a rebuilding.

Reply Brief at 11 (emphasis added). *See also* Federal Defendants' Opposition to AMOS's Motion for Summary Judgment at 12 ("The work performed in Finland was overwhelmingly non-structural").[12] Thus, the Coast Guard applied a "structural/non-structural" test in considering whether the S/S MONTEREY was "rebuilt" abroad. For the reasons set forth below, however, the Court holds that (unlike its regulatory definition) the test the Coast Guard has articulated is not a "permissible construction" of the second proviso.

As the federal defendants have stated, deference should be accorded to an agency's interpretation of a statute "where the administrative determination was made contemporaneously with the statute, is longstanding, and has been applied consistently." Motion to Affirm at 14 (citing *National Muffler Dealers Ass'n v. United States*, 440 U.S. 472, 476, 99 S.Ct. 1304, 1306, 59 L.Ed.2d 519 (1979) and *General Electric Co. v. Gilbert*, 429 U.S. 125, 142–43, 97 S.Ct. 401, 411–12, 50 L.Ed.2d 343 (1976)). The "structural/nonstructural" formulation is none of those things. It is certainly not a contemporaneous interpretation of the second proviso, for the federal defendants have themselves noted that the contemporaneous interpretation that they placed upon the statute in 1956 and in 1960 was the *Grace Meade* definition of "rebuilding" now set forth in the regulations. Motion to Affirm at 2, 13, 15; Opposition to AMOS's Motion for Summary Judgment at 6–7. Nor is the "structural/non-structural" test one which has been consistently articulated over time by the Coast Guard (or its forerunner the Customs Service) in previous rebuilding determinations. The great majority of the agency's rebuild rulings that have been provided to the Court contain *no* standards to guide the rebuild inquiry; they are for the most part one-page letters that consist of a listing of work that the owner had performed and a statement of whether the work would be considered a rebuilding within the meaning of the agency's regulation.[13] As best as the Court can determine, the agency has emphasized "structural" considerations on only two prior occasions. *See* Willis Dec. Attachment I; Carnilla Aff. Exhibit 18 at 2. Deference to the Coast Guard's position would be inappropriate in these circumstances.

Although not entitled to deference, the "structural/nonstructural" approach may still be upheld if it is "a permissible construction" of the second proviso. *Chevron,*

12. Defendant–intervenor MLP echoes this theory. *See* MLP's Motion for Summary Judgment at 36 (pointing out that the Coast Guard "has consistently held that a vessel is not rebuilt unless it undergoes substantial structural modification"); *id.* at 38 (agency "would consider only structural work in determining whether there had been a building upon or substantial alteration of a considerable part of the hull or superstructure").

13. *See, e.g.*, Willis Dec. Attachments A–F, H, J–L; AMOS Reply Brief Exhibit 5; Matson Brief Attachments E & G; AHC Opposition to Federal Defendant's Motion to Affirm, Exhibit A at 3 (COLUMBIA), at 4 (LELAND I. DOAN), at 5 (Aries Marine Shipping Company); Affidavit of Phyllis D. Carnilla (Carnilla Aff.), submitted with MLP's Motion for Summary Judgment, Exhibits 3, 5–7, 9, 11, 13–14, 19–22.

One typical example is the Coast Guard's ruling in the case of the AUSTRAL MOON, which reads in its entirety:

Your letters of 19 and 26 March 1982 concerned the proposed acquisition of the AUSTRAL MOON, official number 530142, by United States Lines, Inc., and its modification from a combination barge container carrier to an all container configuration. You seek a determination that the proposed work, if accomplished abroad, would not be deemed a rebuilding within the meaning of section 67.-37–3, title 46, Code of Federal Regulations and, therefore, that there would be no loss of coastwise trading privileges under section 27 of the Merchant Marine Act, 1920, as amended (46 U.S.C. 883).

Performance of the work specified in the enclosure specified in the enclosure to your letter of 26 March 1982, copy attached, and the stern modification described in your letter of 19 March 1982, would not be deemed a rebuilding within the meaning of section 67.37–3. This conclusion is based solely on the preliminary information you furnished, and any deviation therefrom will require reconsideration.

Willis Dec. Attachment F.

467 U.S. at 843, 104 S.Ct. at 2782. The Court concludes, for a number of reasons, that it is not. First, the agency's "structural/nonstructural" distinction lacks any formal basis of support. The language of the statute, for example, does not suggest this test. And, unlike the agency's regulatory definition—which was drawn from language in the *Grace Meade* decision that was later adopted by the Supreme Court and cited with approval by the Senate, the Coast Guard has pointed to *nothing* in the legislative history of the second proviso *that would support the interpretation now adopted by the Coast Guard.* Finally, the regulations issued by the agency to govern "rebuild" determinations nowhere mention that the agency would premise its decisions on whether "structural" work was done abroad.

The federal defendants do offer one justification for their position, contending that the "rebuild" determination is by its very nature a fact-bound inquiry and that the "structural/nonstructural" test may be derived from their prior rulings. The Court readily agrees with the former assertion, since the modifications performed on each ship, and the configuration of the ship to be rebuilt, will necessarily vary from case to case. The latter point is another matter, however. The two instances in which the agency explicitly based its rulings on "structural" considerations, for example, provide no elaboration of the test.[14] And significant inconsistencies are evident in the other Coast Guard rulings now before the Court:

1. The Coast Guard allowed replacement of a deck on one occasion, Willis Dec. Attachment E, but forbade it on another, Carnilla Aff. Exhibit 11;

2. Bulkhead repairs have been ruled both permissible and impermissible, *compare* Willis Dec. Attachment A *with* Carnilla Aff. Exhibit 9;

3. The addition of engines has been found both to violate the second proviso, *see* AHC Opposition to Motion to Affirm, Exhibit A (COLUMBIA), and to be in accord with it, *see id.* (LELAND I. DOAN), Carnilla Aff. Exhibit 3;

4. The agency allowed the addition of a bow thruster and marine sanitation system in 1984 in the case of the S/S UNITED STATES, *see* Willis Dec. Attachment I, despite the fact that Congress passed special legislation in 1979 exempting the S/S OCEANIC INDEPENDENCE from the second proviso when those *same* changes were made to that ship, *see* Pub.L. No. 96–111, section 1(1)(B);

5. Although stiffeners and deck plating were added to the S/S MONTEREY, AR Exhibit 1 at 5–7, similar work was ruled impermissible in the past, Willis Dec. Attachments A & H; and

6. Differing rulings have been issued on steel renewals, *compare* AHC Opposition to Motion to Affirm, Exhibit A (LELAND I. DOAN) *with* Carnilla Aff. Exhibit 14.

While some of these inconsistencies may be attributed to the factual nature of the "rebuild" determination, they do not permit the conclusion that the agency was making its decisions based solely on "structural" considerations.

Beyond that, the Coast Guard's present interpretation of the second proviso is inconsistent with other views expressed by the agency in the past. For example, plaintiffs and *amicus* claim that the S/S MONTEREY was "rebuilt" within the meaning of the second proviso because $30 million worth of the work was performed in Finland while only $5 million was performed in the United States. In response, the federal defendants emphatically state that "[i]n determining whether a vessel is rebuilt, it is the *nature* of the work, not its cost, that is key." Reply Brief at 11 (emphasis in original). *See also* Opposition to AHC's Motion for Summary Judgment at 4; Willis Dec. at 11. On at least two occasions, however, the Coast Guard has plainly suggested oth-

---

**14.** In one ruling, the agency simply observed that "all of the structural work to be performed on the S/S UNITED STATES will be accomplished in the United States." Willis Dec. Attachment I. And it is difficult to determine the rationale in the case of the PRESIDENT WILSON because large portions of the decision have been excised. Carnilla Aff. Exhibit 18 at 2.

erwise. In 1978, for example, the owner of three tankers sought a rebuild determination for work performed on the vessels. In a memorandum prepared for the Chief of the Merchant Vessel Documentation Division about the case, a Coast Guard official noted:

> The changes did not entail building upon, or substantially altering, a considerable amount of the hull of each vessel (as rebuilding was defined in the *Grace Meade* and in 46 C.F.R. 67.37–3); rather, they included only a bulkhead, piping systems, some machinery items, and a small enclosure on the weatherdeck. *These changes, costing about 2.3% of the value of the vessels, would not constitute rebuilding them.*

Matson Brief Exhibit D at 2 (emphasis added). And in considering the addition of a bulbous bow to the S/T THETIS, a similar memorandum observed:

> The cost of the work is reported to be in the neighborhood of $75,000, which it is stated represents less than 1 percent of the value of the vessel. This comparison also does not result in the work being considerable, substantial or major.

Carnilla Aff. Exhibit 4 at 2.[15] Moreover, the agency has also looked to whether the foreign changes would affect the length, capacity, service or useful life of the vessel, *see* Matson Brief Exhibits D & H; AHC's Opposition to Motion to Affirm, Exhibit A (ARCO Rulings), but the "structural/non-structural" test applied in the case of the S/S MONTEREY does not encompass these other factors.

A further, quite serious problem with the "structural/nonstructural" formulation is that it is so vague that the Court cannot adequately perform its task of judicial review under the APA. One obvious point to be made is that the agency has simply proclaimed that there is a distinction between "structural" and "non-structural"

work but has not—in its rulings, its regulations, its pleadings or its affidavits—explained the difference between the two. Another glaring deficiency in the "structural/non-structural" test is that it fails to take into account the language of the second proviso requiring that all "major components" be rebuilt in the United States. These omissions give rise to a number of unanswered questions that preclude any meaningful judicial review.[16] Given such an amorphous test, the Court is unable to perform its limited role of saying whether the agency has made a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866.

Reliance on the present version of the "structural/nonstructural" dichotomy could also produce unusual results, as the case of the S/S MONTEREY illuminates. While the federal defendants insist that a vessel is not "rebuilt" so long as all structural work is done in the United States, they have also admitted that the ship *did* undergo some structural alterations in Finland. To extricate themselves from this dilemma, they characterize the Finnish work as "minor" in relation to the structural work accomplished in the United States. Motion to Affirm at 26; Willis Dec. at 15. That may be so, but the Coast Guard's need to create a "de minimis" exception to a rule that has no precise contours surely suggests that the formulation it has embraced is far from adequate. For all these reasons, the Court concludes that the "structural/non-structural" test—as it has been articulated (or not articulated) by the Coast Guard to date—is not a "permissible construction" of the second proviso.

Having said that much, the Court also recognizes that it is not empowered to substitute its judgment for that of the Coast Guard on a matter of naval engineering

---

**15.** In its ruling, the agency cited the cost of the project as one factor why it believed that no "rebuilding" had occurred. *Id.* Exhibit 1.

**16.** Aside from the obvious fact that the agency has not stated which systems constitute "structural" parts of a vessel and which are "major components," other difficulties abound. Could a "major component" ever be non-structural? Would a vessel that had undergone non-structural work abroad but no structural work in this country be in compliance with the second proviso? Does the agency consider the propulsion system to be structural or non-structural?

and that it would be manifestly unjust to revoke the license of the S/S MONTEREY because of the inability of the Coast Guard to satisfactorily explain its test. Accordingly, these cases will be remanded to the Coast Guard for further proceedings. *See Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam). On remand, the agency shall reconsider its decision in the case of the S/S MONTEREY in light of the concerns expressed by the Court in this Memorandum Opinion and Order. The agency is, of course, entirely free to adhere to the structural/nonstructural test or to develop another test for making "rebuild" determinations and may, in the latter case, make use of the "structural" theory as one aspect in its decision-making calculus. But in the event that the Coast Guard does continue to rely on "structural" considerations, it must give some definition to the term.[17] And, whether it includes a "structural/non-structural" component or not, the agency should state how it defines a "major component" within the meaning of the second proviso. Finally, no matter what test the Coast Guard chooses to employ in reconsidering the S/S MONTEREY decision, it shall provide an *explanation* of the reasons that lead it to conclude that the test is or is not satisfied. A blanket statement that the second proviso has been complied with simply will not do.

## VI. Pulling Into Port: Conclusion

This Court's voyage is at an end. As set forth above, however, the Coast Guard's is not.

Accordingly, it is

ORDERED that the motions of plaintiffs American Hawaii Cruises and American Maritime Officers Service for summary judgment be and they hereby are denied; it is

FURTHER ORDERED the motion to affirm filed by the federal defendants and the motion for summary judgment filed by defendant-intervenor S/S Monterey Limit-

ed Partnership be and they hereby are denied; it is

FURTHER ORDERED that these actions be and they hereby are remanded for further proceedings consistent with this Memorandum Opinion and Order; and it is

FURTHER ORDERED that these cases be and they hereby are dismissed.

---

**17.** While *common sense* dictates that certain parts of a vessel, such as the hull, are "structural" in nature, the Court has no basis on which to judge whether others, such as engines, fittings, bulkheads, ladders and cabins (to name a few), fit into that category.