**KEYSTONE SHIPPING CO., et al., Plaintiffs,**

v.

**UNITED STATES of America, et al., Defendants. (Two Cases).**

**Civ. A. Nos. 88–3202, 90–2762.**

United States District Court, District of Columbia.

Sept. 2, 1992.

---

Robert J. Blackwell, Sher & Blackwell, Washington, D.C., for plaintiffs.

Arthur J. Volkle, Jr., U.S. Dept. of Justice, Michael Joseph, Dyer, Ellis, Joseph & Mills, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

This is a consolidated action seeking review of decisions of the Maritime Administration ("MarAd"), the Maritime Subsidy Board ("MSB"), and the United States Coast Guard ("Coast Guard") concerning a U.S. vessel built with subsidies, Barge 4102, and a wrecked foreign-built vessel, the Fuji. "Seabulk America" is a vessel constructed from the Fuji and Barge 4102, owned by Seabulk Transmarine Partnership, Ltd. ("Seabulk") and which, pursuant to the decisions here under review, is eligible for and is operating in the United States domestic trades.

Plaintiffs Keystone Shipping Co. and Marine Transport Lines, Inc. (hereinafter "Keystone") operate chemical and tanker vessels in domestic shipping which directly compete with Seabulk. Specifically, plaintiffs challenge three decisions which permit Seabulk America to operate in the domestic trades. They have moved for summary judgment, claiming that the decisions by MarAd, MSB, and Coast Guard were arbitrary and capricious. Plaintiffs challenge the Coast Guard decision that the Seabulk America is the rebuilt Fuji and that as a result is now eligible to participate in the U.S. domestic trades. Plaintiffs also challenge the MarAd and MSB decisions that

rescinded the domestic trading restrictions attached to Barge 4102. Defendants include the United States of America; Samuel K. Skinner in his capacity as Secretary of the United States Department of Transportation; and Admiral William Kine in his capacity as Commandant of the United States Coast Guard (hereinafter "United States"). Defendants have moved to affirm the decisions at issue. Additionally, Seabulk has been permitted to intervene, and has also filed a motion for summary judgment.

For the reasons given below, we find some of the plaintiffs' arguments meritorious, and we remand the cases back to the appropriate agencies for further development of the record in accordance with this opinion.

## I. Background

### A. Statutory Framework

This case takes place deep within the ocean of legislative actions designed to protect the domestic shipping and ship building industries. It is awash with agency determinations under several statutes that provide steep subsidies for ships built within the United States that ply foreign waters and that restrict domestic shipping to unsubsidized United States' vessels.

On the whole, American shipyards are more expensive to operate than foreign yards, and American-built ships cost more than those built outside the United States. Over the years, Congress has addressed this problem by enacting certain statutes. One of these, the Merchant Marine Act of 1936 ("1936 Act"), 46 U.S.C.App. §§ 1101 et seq., establishes various assistance programs to support the construction, operation, and acquisition of American-flag merchant vessels. These programs are designed to allow American ships to compete with those in foreign commerce, and generally they restrict ships that receive the subsidies from operating in coastwise (domestic) trade. Section 501 of the 1936 Act, 46 U.S.C.App. § 1151, establishes a construction-differential subsidy ("CDS") to aid construction of new vessels that will be

used in foreign commerce. Section 506 of the 1936 Act mandates that a vessel which receives a CDS operate "exclusively in foreign trade." 46 U.S.C.App. § 1156.

The 1936 Act also authorizes a capital construction fund ("CCF") which enables the owners of American-flag vessels to acquire vessels with favorable tax treatment given for monies deposited in the funds. Vessels acquired with CCF must be operated "in the United States foreign, Great Lakes, or non-contiguous domestic trade." 46 U.S.C.App. § 1177(k)(2)(C). Further, the 1936 Act establishes an operating-differential subsidy ("ODS") program for American-flag vessels operating in foreign trade. See 46 U.S.C.App. §§ 1171–76.

A second statute, the Jones Act, 46 U.S.C.App. § 883, regulates coastwise or domestic trade. In order for a vessel to be used in domestic trade, the Coast Guard must document the vessel as a United States vessel with a coastwise endorsement. 46 U.S.C. § 12106(b). The coastwise endorsement is obtainable if the vessel has been built in the United States [1] or qualifies under the Wrecked Vessel Act ("WVA"), 46 U.S.C.App. § 14.

The Wrecked Vessel Act, an act of ancient origins, permits any vessel wrecked in United States or adjacent waters and purchased by a United States citizen, to be used in domestic trade if repairs equal to three times the "appraised salved value of the vessel" are performed in a U.S. shipyard. The Coast Guard appoints a board of independent appraisers to assess the value of the salvaged ship and the value of repairs. 46 C.F.R. § 67.19–9.

### B. Barge 4102

The integrated tug/barge Oxy Producer was built by Suwanee River Spa Finance, Inc. using CDS pursuant to Section 501 of the 1936 Act. Consequently, its contract with MarAd limited its use to foreign commerce.[2] MarAd Administrative Record ("MarAd AR") Add.Ex. D.

In 1981, the tug unit of Oxy Producer was lost at sea when it separated from the barge unit, Barge 4102. The storm apparently did not significantly damage Barge 4102. Hvide Shipping, Inc. ("Hvide") and Seabulk Tankers, Ltd. sought MarAd approval to purchase Barge 4102 using monies from CCF. Barge 4102 would remain under the ODS contract which would be assigned to Hvide and Seabulk Tankers. On March 22, 1982, MarAd approved the purchase of Barge 4102 using CCF and the assignment of the contract to Seabulk and Hvide. The assignment of the contract provided that the Barge was still restricted from engaging in domestic trade because it was constructed with CDS. MarAd AR Add.Ex. D.[3]

### C. The Fuji

The Fuji is a tanker built in Japan in 1975. Coast Guard Administrative Record ("Coast Guard AR") Ex. LL. In 1985, an explosion occurred on board and it was towed from approximately 235 miles off Cape Hatteras to a U.S. shipyard. While being towed, the forward portion of the tanker sank, but the surviving stern section was brought to Newport News, Virginia. Coast Guard AR Ex. YY. On April 18, 1985, Seabulk purchased the Fuji for $1,050,000 from Southway Voyage C.V., which had bought the vessel after the explosion. Coast Guard AR Ex. B. Seabulk sought a determination from the Coast Guard that the Fuji had been wrecked in "adjacent waters" within the meaning of the WVA. Coast Guard AR Ex. VV. The Coast Guard determined that the Fuji was wrecked in adjacent waters on June 14, 1985. Coast Guard AR Exs. OO, PP, ZZ.

---

1. A vessel is considered built in the United States if (a) all major components of its hull and superstructure were fabricated in the United States; and (b) the vessel was assembled entirely in the United States. 46 C.F.R. § 67.09–3.

2. The Oxy Producer also received a operating subsidy pursuant to Section 601 of the 1936 Act, which also limited its use to foreign trade. MarAd AR Add. Ex. E.

3. Seabulk then acquired a controlling interest in Barge 4102. In September 1984, MarAd approved a further assignment of the CDS contract in conjunction with the sale of Barge 4102 to Seabulk. MarAd AR Add. Ex. D.

The Coast Guard appointed a board of appraisers that determined the salved value of the Fuji to be $6,703,000. Coast Guard AR Ex. JJ. This determination was based upon an estimate of the current cost of rebuilding a similar stern section in a U.S. shipyard. Seabulk protested the finding, arguing that the appraisers should have taken into account the difference in fuel consumption between a new stern and the Fuji, and claiming that the $1.05 million sales price was indicative of the Fuji's value. Coast Guard AR Ex. FF, GG. Seabulk also claimed that the salved value of the Fuji should be $380,000. Coast Guard AR Ex. FF. The Coast Guard submitted Seabulk's analysis to the board of appraisers, and on January 23, 1986, the board issued a revised estimate which gave a salved value of $3,834,000, taking into account a "fuel differential". Coast Guard AR Ex. CC. The Coast Guard adopted the board's appraisal. Coast Guard AR Ex. CC.

Seabulk proposed that it use Barge 4102 in the Fuji's repair. Accordingly, it sought acknowledgement from the Coast Guard that such action was permissible under the WVA and that the combined vessel would be considered the rebuilt Fuji so that it could be used in domestic trade. *See* Coast Guard AR Ex. AA. The Coast Guard made a preliminary determination that the new vessel would be the rebuilt Fuji. Coast Guard AR Ex. W.

Seabulk then filed an application with MarAd, requesting that MarAd terminate the CDS Agreement and amend the CCF agreements covering Barge 4102. MarAd AR Ex. H. On January 16, 1987, MarAd determined that the domestic trading restrictions imposed on Barge 4102 by the CCF agreements would not apply once Barge 4102 was joined with the Fuji because Barge 4102 would lose its character as a vessel. MarAd noted that the Coast Guard had decided that the joining of the two parts would constitute the rebuilt Fuji, and that was a decision within the Coast Guard's expertise. The removal of the domestic trading restrictions was subject to Seabulk's reduction in the adjusted basis of the vessel by $4.1 million to represent the withdrawal of CCF funds. The MSB ruled as well that the CDS contract could be terminated. MarAd AR Ex. D.

The Coast Guard appointed another board of appraisers to determine the value of the repairs. Coast Guard AR Exs. Q, R, S. The board issued its appraisal on August 20, 1990, finding that the value of the repairs equalled or exceeded $20,409,339, more than three times the salved value of $3.8 million. The board did not include the value of Barge 4102 in reaching this figure. Coast Guard AR Exs. Q, R, S.

On September 20, 1990, the Coast Guard issued its decision that the Fuji was eligible for coastwise trade under the WVA. Coast Guard AR Ex. U. The Coast Guard adopted the findings of the board of appraisers and authorized the issuance of a coastwise endorsement. Coast Guard AR Ex. V.

Three actions have been brought by plaintiffs to challenge these decisions. In August of 1988, plaintiffs filed an action seeking review of the Coast Guard's decision. *Keystone Shipping Co. v. United States*, Civ.Act. No. 88–2393 (*Keystone I*). At that time, plaintiffs were unaware of the MarAd and MSB decisions. When plaintiffs learned of those decisions, they filed another action seeking their review. *Keystone Shipping Co. v. United States*, Civ.Act. No. 88–3202 (*Keystone II*). On January 17, 1990, Judge Harris dismissed *Keystone I* on the grounds that the Coast Guard determination was not administratively final and not ripe for review. On October 31, 1990, Judge Harris of this Court denied a similar motion to dismiss filed in *Keystone II*. On November 9, 1990, the plaintiffs filed a third action, *Keystone Shipping Co. v. United States*, Civ. Act. No. 90–2762 (*Keystone III*), seeking to vacate the Coast Guard's rulings on the use of the Barge 4102 as a "repair" under the WVA and the determination that the Fuji resulted from the joinder of the Fuji and Barge 4102. On December 19, 1990, the Court consolidated *Keystone II* and *Keystone III*. The cases at bar are these consolidated actions.

In summary, the Fuji, as a foreign-built tanker, was barred from participating in the domestic trades unless it received an exception under the WVA. Barge 4102 was also barred from operating in domestic trade as it was built with extensive government subsidy. By action of the Coast Guard, the Fuji was permitted to operate domestically, as falling within the WVA exception to the Jones Act. By action of MarAd and MSB, the domestic trade restrictions on Barge 4102 were lifted when it was joined to the Fuji. Consequently, two vessels which were both initially prohibited from operating in domestic waters were joined into one ship and permitted to so operate.

## II. *Standard of Review*

■ Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate when there are no genuine issues of material fact. Summary judgment is especially appropriate in cases such as this where the Court is called on to review a decision of an administrative agency. In these cases, what is often in issue are not the facts, but whether the agency erred in applying the law. *See, e.g.,* 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2733 at 366–67 (2d ed. 1983).

■ If Congress has spoken to the precise question at issue, then "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). When Congress is silent, the question for the court is whether the agency's interpretation is based on a permissible construction of the statute. *Id.* This is a highly deferential standard. Decisions of administrative agencies are subject to review in federal court under a standard that examines whether the decision was arbitrary and capricious. *See Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); Administrative Procedure Act, 5 U.S.C. § 706(2). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." 463 U.S. at 43, 103 S.Ct. at 2866. A *de novo* review of the facts underlying the decision is not appropriate although the court must " 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Motor Vehicle,* 463 U.S. at 43, 103 S.Ct. at 2866–67 (quoting *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)); *Cooperative Services, Inc. v. United States Department of Housing & Urban Development,* 562 F.2d 1292, 1295 (D.C.Cir.1977).

With this standard in mind, we now turn to the challenged actions.

## III. *The Coast Guard Decision*

Plaintiffs argue that the Coast Guard's ruling that the Seabulk America was the rebuilt Fuji instead of the rebuilt Barge 4102 was rendered in contravention of established law. Essentially, plaintiffs challenge the Coast Guard's determination that the joining of the Fuji and Barge 4102 qualified as a "repair" under the WVA, thereby allowing the rebuilt Fuji to engage in coastwise trade. They charge that the Coast Guard departed from its previous precedent in determining which of the two preexisting vessels survived the merger, and they further challenge the appraisal of the salved value.

In determining that the Fuji was the resulting vessel and that it qualified under the WVA, the Coast Guard necessarily made three determinations: first, they decided that the materials used in a WVA repair did not have to be new; second, they accepted the appraisal by the board as valid; and third and most crucial for this case, the Coast Guard decided that the rebuilt ship was the Fuji and not Barge 4102. We will treat each of these decisions and the plaintiffs' challenges separately.

## A. Wrecked Vessel Act "Repair"

■ Our first step is to determine if Congress has spoken directly to the issue. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). The WVA provides:

> The Commissioner of Customs may issue a register or enrollment for any vessel wrecked on the coasts of the United States or her possessions or adjacent waters, when purchased by a citizen or citizens of the United States and thereupon repaired in a shipyard in the United States or her possessions, if it shall be proved to the satisfaction of the Commissioner, if he deems it necessary, through a board of three appraisers appointed by him, that the said repairs put upon such vessels are equal to three times the appraised salved value of the vessel: *Provided*, That the expense of the appraisal provided for shall be borne by the owner of the vessel: *Provided further*, That if any of the material matters of fact sworn to or represented by the owner, or at his instance, to obtain the register of any vessel are not true, there shall be a forfeiture to the United States of the vessel in respect to which the oath shall have been made, together with tackle, apparel, and furniture thereof.

46 U.S.C.App. § 14 (emphasis in original). The statute does not define "repair" or indicate factors that the agency should consider in ruling on a wrecked vessel application.

We therefore turn to the agency's own regulations to see if they provide more guidance. The Coast Guard regulations relating to the WVA are similarly silent about the precise meaning of the word "repair", or variations thereof, i.e. "repaired," although the regulations indicate that the appraisers are to consider that the vessel will obtain coastwise and fishery privileges.[4] Under the analysis set out in *Chevron*, then, we must uphold the agency determination if it is a reasonable interpretation of the statute.

We find that the Coast Guard's interpretation that the materials used in a qualifying "repair" under the WVA did not have to be newly manufactured was a reasonable one. Prior to the Fuji determination, all Coast Guard repair rulings under the WVA involved new materials. *See* Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Mem.") at 26; United States' Memorandum in Support of Motion to Affirm and Opposition to Plaintiff's Motion for Summary Judgment ("United States' Mem.") at 16. Consequently, this is a question of first impression.

Plaintiffs argue that an interpretation that the WVA permits the use of preexisting materials is contrary to the purpose of

---

**4.** The pertinent Coast Guard regulations define a wrecked vessel under 46 U.S.C.App. § 14 as one which

(a) (1) Has incurred substantial damage to its hull or superstructure as a result of national or accidental causes which occurred in the United States or its adjacent waters; and
(2) Has undergone, in a shipyard in the United States or its possessions, repairs equaling three (3) times the appraised salved value of the vessel.
(b) The determinations of the appraised salved value and that the repairs made upon the vessel are equal to three (3) times that value must be made by a board of three (3) appraisers. The Commandant will appoint the members of the board, and the cost of the board must be borne by the applicant. The owner of a vessel wishing a determination that the vessel is wrecked within the meaning of 46 U.S.C. 14 must submit to the Commandant:

(1) Competent and persuasive evidence of the casualty and its location. Coast Guard situation or investigation reports are acceptable. Other competent and persuasive evidence may be accepted by the Commandant in his discretion.
(2) A writing setting forth the physical location of the vessel, containing a guarantee that the requesting party assumes full responsibility for all costs, liabilities, and other expenses that arise in conjunction with the services performed by the board of appraisers, and stating that, at the time of documentation, the vessel will be owned by a citizen of the United States.
NOTE: Calculation of appraised salved value will include consideration of the fact that the vessel, if in compliance with the Act, will attain coastwise and fishery privileges.
46 C.F.R. § 67.19–9.

the statute. They contend that the WVA was intended to aid American shipbuilding, and that if used materials were permitted, less than the maximum amount of work that could potentially be done would be performed. Plaintiffs' Mem. at 27–28. Defendants argue that there is no requirement in the language of the statute that the maximum possible work be performed and that requiring that all materials be new likely would have prevented the project from being pursued. *See* United States' Mem. at 18–20; Memorandum in Support of Defendant–Intervenor's Motion for Summary Judgment and In Opposition to Plaintiff's Motion for Summary Judgment ("Seabulk Mem.") at 25–28.

In rendering its decision, the Coast Guard specifically considered whether the WVA required all new materials. The Coast Guard indicated that the purpose of the WVA was to provide work for United States shipyards. In a memorandum which states the agency's analysis, the Coast Guard suggested that the argument that using parts of extant vessels would reduce the work for the yards would also extend to the use of premanufactured goods in the

ship repair.[5] The memorandum contends that this is not a viable position.

We cannot say that the use of premanufactured goods or parts of existing vessels is counter to the purposes of the WVA, or that the Coast Guard's interpretation is not reasonable. Perhaps there would be more work performed in United States shipyards if the use of preexisting parts were prohibited, but the statute does not so require. By its terms, the WVA does not mandate any fixed level of United States-based work. Rather, the statute is concerned with the relative amount of added value: that is, work equal to three times the salved value must be performed for the vessel to qualify for domestic trading status.[6]

Since the work on the Seabulk America amounted to more than three times the appraised value of the Fuji wreck, *without* including the cost of the Barge 4102, we need go no further. A different issue would be present if the cost of the "repair" included the purchase price of Barge 4102, for then there would be the risk that very little work would actually be performed by the shipyard, directly countering Congressional intent. Similarly, if the cost of

---

5. The memorandum from the Chief of the Vessel Documentation Branch to the Chief of the Merchant Vessel Inspection and Documentation Division provides:

> 3. Since the 46 U.S.C.App. § 14 is silent regarding the use of existing components, it is necessary to look to the purpose and history of the Statute itself ... It is clear from the legislative history that the purpose of the statute is to provide work for U.S. yards. That purpose may be fulfilled whether the project is completed using all new steel or structural parts of an existing vessel. It may be argued that the use of existing components reduces the amount of work which the yard must do. That argument, however, would also seem to preclude the use of prefabricated shapes made by a U.S. steel producer. Such arguments are not persuasive and suggest that there is some basis for requiring the vessel owner to use the means which will result in the highest possible cost or greatest profit for the shipyard. There is no basis for such an interpretation in the legislative history of the statute.

Memorandum of September 25, 1990, from Chief, Vessel Documentation Branch to Chief, Merchant Vessel Inspection and Documentation Division ("Coast Guard Memorandum"), Coast Guard AR Ex. U. ¶ 3.

6. This does not mean that the use of *any* preexisting parts are permissible. We can envision a scenario where permitting preexisting components to be used in a WVA repair would directly conflict with the principles of the J<sub>o</sub>nes Act, 46 U.S.C.App. § 883. For example, using foreign-built components to repair the ship may qualify under the strict terms of WVA, but may violate the Jones Act. Domestic certification pursuant to the Jones Act is prohibited if a ship, once having been permitted to engage in the coastwise trade, is thereafter rebuilt "unless the entire rebuilding, including the construction of any major components of the hull or superstructure of the vessel, is effected within the United States ..." 46 U.S.C.App. § 883. As the statutes are to be read *in pari materia,* an interpretation of the WVA that would permit the use of preexisting major components that were manufactured abroad would be impermissible. *See Marine Carriers Corp. v. Fowler,* 429 F.2d 702, 706–07 (2d Cir.1970), *cert. denied* 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971).

As Barge 4102 was built in the United States, albeit with heavy subsidy, the defendants contend that the Coast Guard's decision does not run counter to the Jones Act. *See* United States' Mem. at 17 n. 16.

Barge 4102 were included in the qualifying "repair" total, it is not clear that U.S. shipyards would benefit to any great degree. The WVA would simply provide a convenient loophole for ship owners to get a coastwise-eligible vessel at a much lower cost. However, since there were sufficient qualifying repairs without including the cost of Barge 4102, this issue is not presented by this case.

B. The Appraisal Process

■ Plaintiffs also argue that the appraisal by the Coast Guard was flawed because the appraisal board did not determine the value of Barge 4102 or answer five questions put to the board by the Coast Guard.[7] Quite simply, this argument does not hold water. As the Coast Guard recognized,[8] the value of Barge 4102 became a moot issue once the company spent three times the salved value of the wrecked vessel. See Coast Guard Memorandum at ¶ 4. At that point, the vessel qualified under the WVA; no additional expenditures were necessary and the board did not have to answer the questions.

Plaintiffs' next contention that the appraisal process was tainted and flawed is equally meritless. Plaintiffs allege that one of the members of the board of appraisers who determined the salved value

of the Fuji had an improper interest in the vessel. By the Coast Guard's own account, no member of a board of appraisers is to have any direct or indirect interest in the vessel. See Coast Guard AR Ex. Q. Helmut Hertle, one of the original appraisers, was indeed later hired by a bank to oversee the project. However, Hertle did not participate in the appraisal of the repair. Although there is no report in the Administrative Record as to why Mr. Hertle did not participate in the appraisals of the repairs conducted in 1989–90,[9] there is no basis in the record for suggesting that there was any bias in 1985–86, when Hertle did serve.[10] Mere allegations, without more evidence to support them, are not sufficient to overturn the Coast Guard's determination.

C. The Resulting Vessel Determination

■ Plaintiffs' most serious challenge to the documentation under the WVA is that the Coast Guard departed from its precedent without an adequate explanation of its actions in determining that the Seabulk America was the rebuilt Fuji and not the rebuilt Barge 4102. The Coast Guard recognized the importance of its determination as to which vessel was to emerge from the rebuilding in its decision memorandum:

The third and in the present case absolutely crucial question is: Which vessel is

value on repairs. In the present case, the vessel owner is able to meet the "three times the appraised salved value" criteria without including the used components and has elected not to claim the cost of those items. We therefore need not concern ourselves further with this question.
Coast Guard AR Ex. U. ¶ 4.

9. Plaintiffs also allege that Mr. Hertle's firm, Intramarine, Inc. was involved in the repair work. See Plaintiffs' Mem. at 28–29.

10. Although not shown in the administrative record, later documents indicate that after completion of the first appraisal, Mr. Hertle was hired by California Federal Bank to oversee the rebuilding of the Fuji on its behalf. When the Board was appointed to oversee the repairs, Mr. Hertle informed the Coast Guard of his intervening employment, and the Coast Guard determined that it might be a conflict of interest. An alternative appraiser was then chosen. See United States' Mem. Ex. 1.

7. The Coast Guard told the Board to determine:
a. The total cost of repairs put upon the M/V FUJI since February 10, 1986;
b. The cost of repairs put upon the M/V FUJI since February 10, 1986, without including the value of barge 4102;
c. The cost of repairs, included within the total cost, which were necessary to return the vessel to navigation, including the cost of all work necessary to bring the vessel into compliance with applicable Coast Guard safety inspection and certification requirements;
d. The value of barge 4102 immediately prior to its being formed to M/V FUJI; and
e. The value of the steel and other raw materials of which barge 4102 was composed immediately prior to being joined to M/V FUJI.
Coast Guard AR Ex. R.

8. The relevant paragraph in the Coast Guard Memorandum indicates:
The second question need be answered only if the cost of the components used are claimed for the purpose of satisfying the requirement to expend three times the appraised salved

the survivor of the repair project? If the resulting vessel is the FUJI repaired, it may be eligible for coastwise privileges. If on the other hand, the vessel is found to be the barge 4102 repaired, no coastwise privileges are possible because the repaired vessel will include a major component not of U.S. origin; this would cause a loss of coastwise privileges pursuant to the Second Proviso of Section 27 of the Merchant Marine Act, 1920.

Coast Guard Memorandum at ¶ 5. If the rebuilt vessel were considered the Barge 4102, then the use of the stern of the Fuji would mean that a major component was manufactured in Japan, in violation of the Jones Act, 46 U.S.C.App. § 883.

The Coast Guard determined that under a method that compared the length and tonnage of the vessel segments, Barge 4102 would be the survivor. But, the Coast Guard indicated that such criteria "are largely meaningless." Coast Guard Memorandum at ¶ 6(a). Instead, the Coast Guard adopted an approach that looks "to the characteristics of the vessels themselves." Coast Guard Memorandum at ¶ 6(b). The Coast Guard determined that the stern section was from "a self-propelled tank vessel" while the bow was from a "non-self-propelled tank barge." The agency found that since the Seabulk America is a self-propelled tank vessel, it is more like the Fuji than the Barge 4102. "Thus, to deem the 4102 as the surviving vessel, would be to deem the project one of conversion, rather than of repair." Coast Guard Memorandum at ¶ 6(b). Additionally, the Coast Guard considered the configuration of the vessel:

> In the construction of a self-propelled tank vessel, the things which make it unique are in the aftermost section. Although the tanks are common to both the barge and the self-propelled tank vessel, propulsion machinery, crew accommodations, and the navigational facilities are unique to the self-propelled vessel. The configuration of the vessel as it exists is not unlike that of the FUJI before the casualty; it is, however, not similar to the 4102.

Coast Guard Memorandum at ¶ 6(c).

The Coast Guard further asserted that the "heart of any vessel is clearly in the facilities that provide propulsion, navigation control, and accommodation for the crew." Coast Guard Memorandum at ¶ 6(d). All of these derive from the Fuji. *Id.*

Finally, the Coast Guard indicated that while the Barge 4102 was used largely intact, "the Fuji underwent far more work in the direct nature of repairs." Coast Guard Memorandum at ¶ 6(e).[11]

The Coast Guard, like other agencies, may not disregard its own precedents. *See New Orleans Channel 20, Inc. v. Federal Communications Commission,* 830 F.2d 361, 366 (D.C.Cir.1987); *Garrett v. Federal Communications Commission,* 513 F.2d 1056 (D.C.Cir.1975). Plaintiffs allege that in past rulings the Coast Guard has "consistently ruled that the resulting vessel is considered to be the vessel constituting the larger portion rebuilt." Plaintiffs' Mem. at 21. In response, defendants and defendant-intervenor argue that there is no relevant precedent from which the Coast Guard could have departed. United States' Mem. at 29–30; Seabulk Mem. at 17.

All parties appear to be correct in some respect. Although there are no cases concerning the "repair" under the WVA of a ship using major components from two pre-

---

11. The paragraph *in toto* states:
   An argument has been made that the 4102 is being used largely intact in this repair. The argument is acknowledged, but it is noted that the aft section was removed, modifications were made to permit joining the wider 4102 to the FUJI, a bow thruster was installed; in addition, modifications were made to the piping and inert gas systems as well as some of the tanks. The FUJI, however, has undergone extensive repair. A partial list of those repairs included engine overhaul along with modification of the engine room console and installation of a bridge control console, modification of the crew spaces to meet U.S. standards, and work to relocate cargo handling equipment aboard the 4102. While items were removed from the 4102 and it was made ready for its new trade, the FUJI underwent far more work in the direct nature of repairs. Coast Guard Memorandum at ¶ 6(e).

viously existing ships, there are several decisions which address the Coast Guard's Jones Act rebuild determinations.

As we have previously noted, both the Jones Act and the WVA arguably serve to protect American shipowners from unfair competition from foreign-built vessels. *See, e.g., Manhattan Tankers, Inc. v. Dole,* 787 F.2d 667, 670 n. 3 (D.C.Cir.1986); *Marine Carriers Corp. v. Fowler,* 429 F.2d 702 (2d Cir.1970), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971); *American Hawaii Cruises v. Skinner,* 713 F.Supp. 452, 457 (D.D.C.1989) (court's inquiry expanded beyond the second proviso of Jones Act to include coastwise laws as a whole); 36 Op. Att'y Gen. 302, 310–11 (1930) (construing both to reflect a consistent policy); Preamble Discussion of Regulations Implementing the Wrecked Vessel Statute, 47 Fed.Reg. 27,492 (1982). Both Acts should be read consistently.[12] Indeed, the agencies recognize this. When the Coast Guard has discerned that the WVA was being used to evade the strictures of the Jones Act, it has modified the regulations to prevent such abuse. For example, the agency added a regulation that required the value of the future coastwise trading to be included in the appraised salved value.[13] As the statutes should be not construed inconsistently, we look to the Coast Guard's rebuild decisions pursuant to the Jones Act to aid us in determining whether the agency acted arbitrarily or capriciously in this case.

Examination reveals that other judges have confronted the same problems with Jones Act cases as we are faced with in this WVA case. Many of the rebuild decisions center on what type of repair work may be performed abroad without running afoul of the Jones Act prohibition on rebuilding outside of the United States and its territories. *See* 46 U.S.C.App. § 883. For our purposes, the most similar case was presented by *Marine Carriers Corp. v. Fowler,* 429 F.2d 702 (2d Cir.1970), *cert. denied,* 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971). In *Marine Carriers,* the issue was whether the vessel Observer was eligible for coastwise trade under the Jones Act. The Commissioner of Customs had determined that the Observer would be ineligible for coastwise trade, and plaintiff sought review from the court. The Observer was an oil tanker constructed from the *forebody* of the Wapello and the *stern* of the Trustco. The Wapello was not eligible for coastwise trade as its forebody had been used in the construction of the Santa Helena, a ship manufactured in a Japanese shipyard. The same forebody was then used in the Observer. On the other hand, the Trustco was documented for domestic trade. If the Observer was considered the rebuilt Trustco, it could be documented for coastwise trade, but if it was the rebuilt Wapello, it would be ineligible. 429 F.2d at 709.

The Second Circuit could not for itself determine whether the rebuilt Trustco or the rebuilt Wapello resulted from the joining,[14] and remanded the case for a trial. 429 F.2d at 710.

Similarly, Judge Joyce Hens Green of this Court limited the Coast Guard's discre-

**12.** It is especially important to read the Acts consistently in light of MarAd's determination that if the WVA were satisfied, then the 1936 Act is also satisfied. See *infra.*

**13.** In so doing, the agency noted:
Events have shown, however, that foreign vessels requiring little repair or renovation were being appraised at a low value which did not account for future coastwise privileges, thus allowing these vessels to attain those privileges with very little work actually being performed in United States shipyards.... This permitted vessels to attain coastwise privileges with relatively little cost and to compete unfairly with more expensive United States built vessels.... Obviously, these financial inducements could provide considerable rewards to intentional wrecking of a foreign-built vessel on United States shores; surely this was not Congress' intention.
See Preamble Discussion of Regulations Implementing the Wrecked Vessel Statute, 47 Fed. Reg. 27,492 (1982).

**14.** Like the case at bar, there were competing factors in the determination of which ship was rebuilt. "The OBSERVER's forebody, which as we have noted, was the forebody of the WAPELLO, comprises three-quarters of its total length. On the other hand, its stern, formerly the stern of the TRUSTCO, apparently is far more valuable than the forepart." 429 F.2d at 704.

tion in rebuild determinations when the agency's determination has not been supported by the underlying statute. In *American Hawaii Cruises v. Skinner,* 713 F.Supp. 452 (D.D.C.1989), the Coast Guard had used a test that analyzed whether the repairs were structural or not to determine whether the ship would fall under the rebuild classification. The district court determined that this approach was not a permissible construction of the second proviso of the Jones Act. 713 F.Supp. at 466. The court noted that the Coast Guard's approach was not subject to deference because it neither had been made contemporaneously with the statute nor been applied consistently over time. *Id.* Although the approach could still be upheld if it was a permissible construction of the second proviso of the Jones Act, 713 F.Supp. at 467, the court found that the structural/nonstructural test was not supported by the statute:

> First, the agency's 'structural/nonstructural' distinction lacks any formal basis of support. The language of the statute, for example, does not suggest this test.... [T]he Coast Guard has pointed to nothing in the legislative history of the second proviso that would support the interpretation now adopted by the Coast Guard. Finally, the regulations issued by the agency to govern 'rebuild' determinations nowhere mention that the agency would premise its decisions on whether 'structural' work was done abroad.

713 F.Supp. at 467. The court noted that the "great majority of the agency's rebuild rulings that have been provided to the Court contain *no* standards to guide the rebuild inquiry; they are for the most part one-page letters that consist of a listing of work that the owner had performed and a statement of whether the work would be considered a rebuilding within the meaning of the agency's regulation." 713 F.Supp. at 466. The court remanded the decision to the Coast Guard for further proceedings with instructions to give definition to the structural test. 713 F.Supp. at 469.

We find ourselves in a similar position to Judge Green in *American Hawaii Cruises,* unable to perform our "limited role of saying whether the agency has made a 'rational connection between the facts found and the choice made' " 713 F.Supp. at 468 (quoting *Motor Vehicle Manufacturers Assoc. v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983)). We find it impossible to discern any clear policy from the rebuild decisions in the record. Some of the brief decisions seem to rely upon length and tonnage, whereas others do not. Some are based on the age of the vessels whereas in others the new ship did not take the identity of either vessel.[15]

Accordingly, we are unable to satisfactorily review the Coast Guard's decision. This Court clearly does not have the expertise needed to independently resolve which ship is the rebuilt Seabulk America. And yet we cannot perform the mandated review as the record is too sparse to determine why the Coast Guard relied on the factors it did, and how those factors are consistent with the purpose of the WVA. The list of factors given by the Coast Guard seem plucked out of the water—and

---

15. For example, when two vessels were rebuilt from the stern and forebody of the Fredricksburg, the vessel resulting from the stern of the Fredricksburg was not a "new" vessel but was "deemed as rebuilt from the stern of the Fredricksburg." However, both the vessels built from the stern and forebody were given new official numbers, and the mortgage that had previously remained on the Fredricksburg was considered as outstanding on both of the resulting vessels. *See* Letter from Joseph Yglesias to Joseph Barone of December 2, 1980, Seabulk Mem.Ex. 2. When the Spitfire was rebuilt from the hull of the Esso Buffalo and the forebody of the Esso Syracuse, it did not retain the identity of either vessel, although it was to be classified as being rebuilt with the age of the oldest vessel. *See* Letter from J.P. Tebeau to Joseph Kelly of November 18, 1963, Seabulk Mem.Ex. 3. When the stern and bow of the Bladensburg were joined with a newly-fabricated hull and the midbody of the Mispillion, to create the Transsuperior, the resulting vessel was no longer considered the Bladensburg. Seabulk Mem.Ex. 10. *See also* Letter from Robert McIntyre to Miss Cermak of January 31, 1961, Seabulk Mem.Ex. 6 (when bow of Charles M. Schwab was added to stern of Gulfport and new midbody reconstructed, vessel did not retain identity of either vessel).

in some ways contrary to the decisions which govern rebuild decisions under the Jones Act. As the Acts are to be read *in pari materia*, conflicting approaches must be explained.

Consequently we are remanding the case to the Coast Guard for a fuller explanation of its decision, and how it comports with the WVA. If indeed, the agency determines that the rebuild standards for the Jones Act and the WVA differ, it should explain such differences, and similarly explain how the different approaches comport with the ideal of reading the Acts consistently.

## IV. *The MarAd Decision*

### A. MarAd's Reasoning

Plaintiffs also challenge MarAd's and MSB's decisions to remove domestic trading restrictions from Barge 4102. They claim that the decisions contravene the purposes and policy of the 1936 Act, were made in violation of law, ignore previous MarAd determinations, and thus were arbitrary and capricious. We find that several of plaintiff's claims are meritorious and warrant further review.

Barge 4102 had been restricted from operating in the domestic trades by Sections 506 and 607 of the 1936 Act. These statutory provisions tied the receipt of construction and operating subsidies to operation in foreign trade and prohibited Barge 4102 from being used in coastwise trade.[16] Seabulk affirmatively agreed that these restrictions would bind it when it purchased Barge 4102. *See* MarAd AR Add. Ex. D.

MarAd based its decision to remove trading restrictions from Barge 4102 on the premise that the barge lost its identity as a vessel when it was joined with the Fuji.[17] *See* Memorandum of December 23, 1986 from Robert J. Patton to James Wescott

("MarAd Decision"), MarAd AR Ex. F. The decision memorandum concluded:

> Under agency precedent, Barge 4102, upon being cut up and joined with the FUJI would lose its identity as a vessel and, having lost that identity, the restrictions of Section 506 and, logically, Section 607 are extinguished. However, by virtue of the substantial tax benefits for the Barge 4102 purchase money, appropriate tax reconciliation is required.

MarAd Decision at 2. In reaching this conclusion, MarAd first noted that the Section 506 restrictions would remain on Barge 4102 until the barge lost its character as a vessel:

> The loss of the tug component of the OXY PRODUCER did not vitiate the barge's domestic trading restrictions because the barge, though constructed as part of an integrated unit, was, upon delivery, awarded vessel documentation and an official number independent of the tug and, therefore, itself constituted a vessel. Upon purchase of the barge with CCF, Seabulk agreed to be bound by the restrictions of Sections 506 and 607 of the Act. These restrictions remain until (1) the barge either loses its character as a vessel or (2) the barge reaches the end of its statutory life pursuant to the applicable provisions of the Act.

MarAd Decision at 2.

MarAd determined that the barge lost its identity as a vessel once it was joined with the Fuji. MarAd relied on two earlier rulings in which it had relieved hulls of their CDS restriction where it found that the hull lost its character as a vessel, decisions concerning the C.V. Seawitch and the CCT Tug 034. MarAd Decision at 3. "These Board decisions also found that release of CDS restrictions as to these selected components in a reconstructed vessel would not

---

**16.** Barge 4102 was originally built using CDS and subsequently purchased by an affiliate of Seabulk using CCF funds. Consequently, it was a qualified agreement vessel pursuant to Section 607 of the Marine Merchant Act, as amended. 46 U.S.C. § 1177.

**17.** The decision's rationale is given in a six-page memorandum from Robert Patton, the deputy chief counsel for MarAd, to James Wescott, Director of the Office of Ship Financing, in which Patton reviewed a letter submitted by Seabulk's counsel to determine whether the restrictions on coastwise trading would run to the rebuilt Fuji.

violate Section 506's intent to shield the domestic fleet from the unfair competition with CDS vessels." *Id.*

MarAd relied on the Coast Guard's determination that the rebuilt vessel would be the Fuji, and not the Barge 4102.

> The instant request presents an extension of these principles to the case where substantial parts of the CDS vessel are preserved but the resulting vessel is not the CDS vessel. Specifically, the proposal is to cut off 80 feet of the barge (which represents some 13% of its present 626 foot length) and make necessary structural pumping and ballast modifications. These modifications, though substantial, will fall far short of dismantlement. Nevertheless, the Coast Guard has determined that after removal of the stern and the joining with the Fuji the resulting vessel will be the FUJI. Since that determination is peculiarly within Coast Guard's expertise and since it appears to be well grounded because the reconstituted vessel will be predominantly the FUJI, it follows that the Barge will lose its character as a vessel. Accordingly, the 506 restrictions would not survive.

MarAd Decision at 4.

MarAd then briefly considered whether the decision would be consistent with the purpose and policy of the 1936 Act. However, since the Coast Guard had determined that the Fuji would qualify for domestic trade under WVA, MarAd determined that the "purposes and policy of the Act are met by compliance with the Wrecked Vessel Act." MarAd Decision at 4. The agency noted that it would be inconsistent with the WVA over which MarAd did not have any jurisdiction, to find that when a resulting vessel qualified as a wrecked vessel, it nevertheless contravened the purposes of the 1936 Act. *Id.*

The Section 607 restrictions, which limits operations in vessels acquired with CCF funds, were also lifted because "the restrictions will not have any vessel on which to attach" since the Barge would not survive the joining with the Fuji. MarAd Decision at 5.

Finally, MarAd determined that to preserve Barge 4102's tax advantages would be inappropriate:

> Preliminarily, it could be argued that just as the barge lost its identity as a vessel, it lost any identity with the tax advantages [from CCF]; under that rationale no tax consequences would follow the reconstituted vessel. This argument is tenuous here because the Barge survives the joining in substantial part.

MarAd Decision at 5. MarAd determined that a reduction in the basis by $4.1 million would be an appropriate response. MarAd Decision at 6.

MarAd and MSB received the decision memorandum on January 9, 1987. *See* MarAd AR Ex. E. On January 16, 1987, MSB and MarAd determined that the geographic trading restrictions set forth in Section 506 and Section 607 would not apply to the Seabulk America and that the tax basis of the vessel would be reduced. *See* MarAd AR Ex. D. However, it is not clear from the administrative record whether MarAd or MSB ever explicitly adopted the memorandum setting out the analysis.

### B. Procedural Challenges

■ Plaintiffs challenge the procedure followed by MarAd and the MSB in removing the trading restrictions. Plaintiffs claim that MarAd ignored a line of precedent that requires the administration to provide adequate opportunity for notice and to perform an analysis of the competitive effect of the waiver on the unsubsidized fleet before lifting the trading restrictions. *See* Plaintiffs' Mem. at 32–33.

Specifically, plaintiffs argue that the administration neither provided an adequate opportunity for notice and comment nor considered the competitive impact of the removal of the restrictions as required by the Administrative Procedure Act and related case law. *See* Plaintiffs' Mem. at 32–42. Defendants counter that the Barge 4102 decision was an informal adjudication under section § 555 of the APA that does not require formal notice. *See* United States' Mem. at 48–49.

This Court is charged with the responsibility of ensuring that actions by MarAd harmonize with the agency's statutory mandate. *See Independent United States Tanker Owners Committee v. Lewis,* 690 F.2d 908, 917 (D.C.Cir.1982) (*ITOC I*). There are two steps to a review of an informal adjudication, as explained by the District of Columbia Circuit in *ITOC I:*

First, we must review the record to ensure that MarAd's decision is not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' The critical elements of such review are clear. While MarAd's decision is "entitled to a presumption of regularity," the presumption "is not to shield ... action from a thorough, probing, in-depth review." Thus, though we are not permitted to substitute our judgment for MarAd's, our inquiry must be "searching and careful," and we must ensure "both that [MarAd] has adequately considered all relevant factors ... and that it has demonstrated 'a rational connection between the facts found and the choices made.' "

Our second obligation is to examine the procedures MarAd employed in reaching its decision to ensure that they comply with the APA and any applicable statutory or constitutional requirements.

*ITOC I,* 690 F.2d at 922 (citations omitted). Under this two-pronged analysis, we find that MarAd did not adequately consider all relevant factors, having, in large part, abdicated its responsibility to oversee the 1936 Act to the Coast Guard. However, the agency did fulfill the letter of its procedural requirements under the APA. Notice and comment are not required.

MarAd chose to proceed with Seabulk's application on an informal basis rather than through a rulemaking procedure. This decision was well within its discretion. " '[T]he choice between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency.' " *ITOC I,* 690 F.2d at 917 (quoting *SEC v. Chenery,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947)). As an informal adjudication, APA § 555 does not require any notice and comment to interested

parties. Consequently, MarAd is not bound by the APA's provisions for notice and comment for rulemaking.

We must agree with defendants that MarAd's failure to notify plaintiffs of the pending determination and to provide an opportunity for comment does not make MarAd's determination arbitrary and capricious.

■ Nevertheless, we find ourselves unable to adequately review MarAd's and MSB's decisions based on the record before us. MarAd may not substitute new goals in place of the statutory objectives of the 1936 Act without explaining how its actions are consistent with the statute. *Independent U.S. Tanker Owners Committee v. Dole,* 809 F.2d 847, 852 (D.C.Cir.), *cert. denied* 484 U.S. 819, 108 S.Ct. 76, 98 L.Ed.2d 39 (1987) (*ITOC II*); *Marine Transportation Services Sea–Barge Group, Inc. v. Busey,* 786 F.Supp. 21, 31–32 (D.D.C.1992). The goals of the 1936 Act are, however, well-known. In *Seatrain Shipbuilding Corp. v. Shell Oil Co.,* 444 U.S. 572, 100 S.Ct. 800, 63 L.Ed.2d 36 (1980), the Supreme Court recognized that the 1936 Act had several purposes; to foster the development of a "large and effective merchant marine capable of meeting the Nation's future commercial and military needs", 444 U.S. at 584, 100 S.Ct. at 807, and to protect the unsubsized domestic fleets from displacement from subsidized fleets. 444 U.S. at 586, 100 S.Ct. at 808; *see also Liberty Maritime Corp. v. United States,* 928 F.2d 413, 419 (D.C.Cir.1991); *Atlantic Richfield Co. v. United States,* 774 F.2d 1193 (D.C.Cir.1985).

However, MarAd did not evaluate how its decision comported with these goals. MarAd declined to analyze the competitive effect of lifting the restrictions, merely stating that the WVA did not envision any such analysis. *See* MarAd Decision at 4. The agency completely abdicated its responsibility to decide whether the restrictions would remain with the vessel, stating "it would be inconsistent with the Wrecked Vessel Act, over which MARAD has no jurisdiction, to find that when the resulting

vessel qualified as a wrecked vessel, it nevertheless would contravene the purposes and policy of the 1936 Act to operate in the domestic trade." MarAd Decision at 4. Although a finding that the WVA would override any determination under the 1936 Act may ultimately prove correct, the mere statement of such is insufficient for MarAd to abdicate its role in such a way.

Moreover, the Coast Guard's determination that the rebuilt Fuji qualified as a wrecked vessel is completely distinct from MarAd's power to oversee the 1936 Act. The Fuji stern could have been rebuilt *without* using the forebody of a vessel that had Sections 506 and 607 restrictions attached. It is unclear why Seabulk should be permitted—without any analysis of the competitive effects—to use a restricted vessel in a WVA repair and thereby avoid MarAd's competitive effect analysis. The letter to Seabulk informing them of MarAd and the MSB's decisions made no reference to the purpose of the Act, *see* MarAd AR Ex. D, and the staff memorandum only reflected "that the purpose and policy of the Act are met by compliance with the Wrecked Vessel Act." MarAd Decision at 4. This is an insufficient explanation of reasons for this Court to adequately review.

Defendants now proffer several reasons why MarAd's decision was consistent with the 1936 Act. For example, they suggest that removing the restrictions brought $20 million in work to U.S. shipyards, a purpose fully consistent with the 1936 Act.[18] *See* United States' Mem. at 41–42. However, defendants miss the boat. The point is not whether there are reasons for MarAd's decisions, but that MarAd did not explain them, making judicial review impossible. *Post hoc* rationalization is not sufficient to meet the agency's requirement of reasoned explanation.

We are not in a position to decide the merits of MarAd's decision that Barge 4102 lost its status as a vessel when it was joined to the Fuji on the basis of the record here. However, MarAd cannot abdicate its responsibility to oversee the 1936 Act by the simple statement that compliance with the WVA satisfies the 1936 Act. Accordingly, we remand [19] this case to the agency for reconsideration and explanation, in light of the Coast Guard's similar review and our comments here.

In conclusion, we hereby deny Defendants' Motion to Affirm and Defendant-Intervenor's Motion for Summary Judgment. We grant Plaintiffs' Motion for Summary Judgment in part, and we remand these cases to the Coast Guard, MarAd, and MSB for a fuller explanation of their actions in accordance with this Opinion.

**18.** Defendants postulate that MarAd adopted the reasoning given in the Seawitch and Tug 034 cases. *See* United States Mem. at 44. They argue that since in the Seawitch decision,

> MarAd expressly considered the economic value and potential uses of the vessel, the residual vestiges of governmental CDS participation in the vessel, and the cost and nature of reconstruction, and considered the benefits which would accrue, both in the avoidance of economic waste and in the creation of unsubsidized shipyard work. MarAd concluded that, in light of these factors, a determination that the contractual trading restrictions applicable to a vessel would terminate when the vessel lost its identity through incorporation is consistent with *the whole* of the 1936 Act.

*Id.* at 43. It is noteworthy that, unlike the Seawitch, MarAd did *not* expressly consider the economic value and potential uses of the vessel for the Barge 4102. This is the kind of analysis that would prove useful.

**19.** Where a "reasonable explanation" is missing, the Court may remand for further proceedings. *See, e.g., ITOC I,* 690 F.2d 908; *American Trading Transportation Co. v. United States,* 841 F.2d 421, 426 n. 9 (D.C.Cir.1988); *American Hawaii Cruises v. Skinner,* 713 F.Supp. 452, 469 (D.D.C. 1989), *appeal dismissed,* 893 F.2d 1400 (D.C.Cir. 1990). Indeed, a remand to the agency is the preferred course of action. *See Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633, 654, 110 S.Ct. 2668, 2680, 110 L.Ed.2d 579 (1990).